889 A.2d 325

**Frederick James MOORE**

v.

**STATE of Maryland.**

**No. 28, Sept. Term, 2004.**

Court of Appeals of Maryland.

Dec. 14, 2005.

Reconsideration Denied Feb. 3, 2006.

344

Julia M. Kazaks, Assigned Public Defender (W. Bradley Ney, Albert H. Turkus, and Kenneth W. Gideon of Washington, D.C.) on brief, for petitioner/cross-respondent.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, Judge.

Petitioner, Frederick James Moore, was convicted by a jury in the Circuit Court for Howard County of first degree murder of Ashley Nicole Mason. Prior to trial, the State conducted DNA analysis on evidence found at the scene of the crime, and petitioner, who was represented by private counsel but for purposes of the motion was conceded to be indigent, requested state-funded expert assistance in the field of DNA analysis to prepare his defense. The trial court denied petitioner's motion on the grounds that the Office of the Public Defender was not required to pay for an expert when a defendant is represented by private counsel, and that the trial court had no funds to pay for an expert. The Court of Special Appeals affirmed. *Moore v. State,* 154 Md.App. 578, 841 A.2d 31 (2004). We granted Moore's petition for a writ of certiorari, to consider the following questions:

I. Is a criminal defendant who is unable to afford the assistance of a DNA expert, but who has retained private counsel using his limited personal funds, entitled to public funding for expert assistance under Article 27A of the Maryland Code where the most extensive testimony offered against the defendant at trial was that of the State's DNA expert?

II. Is a criminal defendant who is unable to afford the assistance of a DNA expert, but who has retained private counsel using his limited personal funds, entitled to public funding for expert assistance under the United States and

Maryland Constitutions where the most extensive testimony offered against the defendant at trial was that of the State's DNA expert?

III. Did the ruling below improperly limit this Court's decision in *Sessoms v. State*, 357 Md. 274, 744 A.2d 9 (2000), by denying [petitioner] the opportunity to introduce evidence relating to the past violent acts of a separately tried co-defendant, where [petitioner's] trial centered on the relative roles of [petitioner] and that co-defendant and [petitioner]'s theory of the case was that the co-defendant committed the murder alone?

*Moore v. State*, 381 Md. 674, 851 A.2d 593 (2004). We granted the State's conditional cross-petition, containing the following questions:

I. Assuming *arguendo* that a defendant who has paid for a private attorney using his own funds could, under some circumstances, be considered "indigent" for constitutional or statutory purposes, did Moore fail to establish: (1) his indigence in this case, or (2) that a substantial question existed requiring the testimony of a defense DNA expert or that his defense could not be developed without such testimony?

II. Even assuming *arguendo* that the trial court erred in declining to order either the Office of the Public Defender or the Circuit Court for Howard County to provide funds to obtain the testimony of Moore's DNA expert, was such error harmless beyond a reasonable doubt where the DNA evidence was essentially cumulative to evidence from other sources and where there was overwhelming non-DNA evidence establishing Moore's guilt?

III. Is Moore's complaint regarding the exclusion of evidence unpreserved for appellate review where there was no proffer regarding the contents of the evidence and where one of the witnesses Moore wished to cross-examine about alleged prior assaults by his co-defendant answered "no" when asked if the co-defendant had assaulted her?

## I. Facts

On the morning of November 3, 2000, a delivery driver discovered a pool of blood in the parking lot of a Howard County restaurant. Following a bloody trail into the woods, he discovered the lifeless body of fourteen-year-old Ashley Nicole Mason. The medical examiner later determined the cause of Mason's death to have been multiple stab wounds and strangulation.

Petitioner and Scott Jory Brill were indicted by the Grand Jury for Howard County for the murder.[1] Pursuant to Md. Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.), § 10–915(c) of the Courts and Judicial Proceedings Article,[2] the State served Moore with a timely Notice of Intention to Introduce DNA Evidence. The State provided Moore with documents produced by Cellmark Diagnostics, Inc. ("Cellmark"), detailing results obtained by Cellmark in its laboratory analysis of evidence recovered from the crime scene.

Moore filed a motion captioned "Defendant's Motion To Have the Circuit Court for Howard County or the Office of the Public Defender Provide Financial Aid to the Defendant

---

1. Brill and Moore were tried separately and each was convicted of the murder of Ashley Mason.

2. Section 10–915(c) of the Courts and Judicial Proceedings Article provides as follows:

 "In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile:
 (1) Notifies in writing the other party or parties by mail at least 45 days before any criminal proceeding; and
 (2) Provides, if applicable and requested in writing, the other party or parties at least 30 days before any criminal proceeding with:
 (i) First generation film copy or suitable reproductions of autoradiographs, dot blots, slot blots, silver stained gels, test strips, control strips, and any other results generated in the course of the analysis;
 (ii) Copies of laboratory notes generated in connection with the analysis, including chain of custody documents, sizing and hybridization information, statistical calculations, and worksheets;
 (iii) Laboratory protocols and procedures utilized in the analysis;
 (iv) The identification of each genetic locus analyzed; and
 (v) A statement setting forth the genotype data and the profile frequencies for the databases utilized."

for the Purpose of Providing a DNA Expert to Testify for the Defendant" (Funding Motion). In addition to asserting Moore's inability to pay for the services of a DNA expert [3], the Funding Motion contained the following statements:

"1. That the defendant is charged with a very serious offense of murder in the first degree.

2. That at no time did the defendant, Frederick Moore, give a statement implicating himself in the offense.

\* \* \*

5. That ... defendant's mother, Anita Moore, was able to scrape together $1000.00, said funds which were paid to J. Thomas McClintock, Ph.D., a microbiologist and molecular biologist as well as an expert in the field of DNA testing.

6. That counsel for defendant sent to Dr. McClintock all of the materials sent to counsel by the Office of the State's Attorney for Dr. McClintock to review.

7. That after his review of the materials, Dr. McClintock provided defendant's counsel with a preliminary opinion regarding the DNA testing used in the case against Frederick Moore.

\* \* \*

10. That the defendant believes he would be seriously prejudiced if the Court were to deny his request.

11. That the defendant believes that, BUT FOR THE FACT THAT HE IS POOR AND COMES FROM A POOR FAMILY, he would be able to hire the DNA expert which the defendant and his counsel believe would be extremely important to help explain to the jury that there are two sides to every DNA test result.

12. That the defendant believes that it is prejudicial to him if he is denied the right to have an expert witness testify on

---

**3.** The record indicates that Moore retained counsel using funds he received in a personal injury settlement contemporaneous to his arrest for the instant offense. He asserted that he was currently "without a job or funds to pay for the services of a DNA expert" due to his incarceration pending trial.

his behalf while the State is allowed to have an expert witness even though counsel for the State is not required to pay for the services of the DNA expert.

13. That counsel for defendant filed with the Honorable Court a Motion to Suppress DNA evidence and as part of the memorandum in support of his motion, counsel for defendant listed a number of areas in which mistakes can be made by the State's expert. That unless counsel for the defendant is allowed to have an expert to support the defendant's contention, the defendant will be unjustly prejudiced."

In the Suppression Motion to which Moore refers in paragraph 13 of the Funding Motion, Moore stated, in pertinent part:

"9. According to the FBI standards, which have not been established as proof beyond a reasonable doubt to show guilt, nine of thirteen loci are necessary to establish proof, although again NOT BEYOND A REASONABLE DOUBT, to show that the DNA recovered at a scene of a crime is associated to a particular GROUP of individuals rather than a specific individual. In fact, when providing results, so called experts of DNA testing will state, among other things, that a person CAN NOT BE EXCLUDED as the person providing the DNA. At no time can the DNA expert state conclusively that DNA evidence can be linked conclusively to any particular person or that a particular person was present at the scene of the crime.

10. That according to the results of the DNA testing, either Scott Brill or Frederick Moore could be included as the provider of the DNA found at the scene of the crime but the results do not state conclusively that Frederick Moore was present at the scene of the crime or that the DNA was conclusively the DNA of Frederick Moore."

The Circuit Court denied the Suppression Motion.

At a hearing on the Funding Motion, Moore's counsel again represented to the Circuit Court that Moore could not afford a DNA expert. With respect to Dr. McClintock, counsel stated:

"Dr. McClintock has, in fact, worked with me on this case to a degree. We were able to come up with some funds, initially, to get the doctor to help me with some preparation. His fee is $225.00 per hour, with a minimum of four hours and a maximum of ten hours. I don't anticipate there being ten hours of work here, so I would imagine somewhere between the four and the ten at a cost of $225.00 per hour."

Regarding the usefulness or necessity of a DNA expert's services in Moore's case, Moore represented as follows:

"[W]e got into all of the DNA testimony and evidence, rather, and it became quite obvious that Mr. Moore would be prejudiced if he were not allowed to have an expert as the State was allowed to have an expert.

* * *

I do feel it's a prejudice to anyone who comes before the Court on a serious matter where experts are necessary. . . . It's just impossible for anyone to properly defend a case unless they have thousands and thousands of dollars just to pay experts."

The District Public Defender for Carroll and Howard Counties appeared at the hearing by the consent of both parties. She informed the court that it was the Public Defender's policy not to provide funds for experts in "private counsel cases," that she had spoken to her superiors, the Public Defender and Deputy Public Defender, about Moore's case, and that these officials had been unwilling to make an exception to the policy. The State indicated, both in its written response to the Funding Motion and orally at the hearing, that it took no position as to Moore's request.

Following a brief recess, the court made the following oral ruling:

"I just confirmed with Judge Leasure, the administrative Judge, that—with reference to the availability of Court funds and she confirms or advises me that there are no Court funds dedicated or available to provide in general for experts in cases where an individual will have private coun-

sel and, specifically, there are not funds available—Court funds available to provide for the expert in this case. I am mindful of the Appellate Courts of the Fourth Circuit opinion in the *Miller* case [*Miller v. Smith*, 115 F.3d 1136 (4th Cir.1997), *cert. denied sub nom Miller v. Corcoran*, 522 U.S. 884, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997) ] that, as I understand it, suggests that there is a vehicle afforded in the State of Maryland to provide counsel and the costs incurred and appeals and, as [the District Public Defender] said, the issue in the *Miller* case was the cost of a transcript but, I think, by analogy, it would apply to a case where a Defendant who has private counsel, seeks funds to utilize for an expert in this case. I'll not, since, as I understand it, [defense counsel] is privately retained—You haven't been referred as—this case by the Public Defender and this is not a Panel case if I can use that term and that may not be the correct term—you're privately engaged in this case.... And I would not direct the Office of the Public Defender to provide fees in this case since they are not counsel of record in the case. So, I'll specifically deny your request."

Moore did not testify at the trial. His defense, conveyed to the jury by way of argument of counsel, was that although Moore was present at the scene of the crime, Scott Brill had acted alone in killing Mason, while Moore stood by, fearing for his own life. In his opening statement to the jury, defense counsel stated as follows:

"Was Frederick Moore at the scene when Ashley Mason was killed? Yes. He was. And Frederick Moore saw what Scott Brill did.... Frederick Moore was scared to death. Frederick Moore thought he might be next because there was no logic to what Scott Brill did."

The State presented testimony that evidence had been collected at or near the crime scene. These items included blood recovered from the restaurant parking lot, Mason's underwear, two "do-rags" (head coverings) recovered from bushes near Mason's body, a bloody knife discovered by a garbage collector near the restaurant, clippings from Mason's

fingernails, and swabs taken from Mason's ankles, vagina, and anus.

The State called Dr. Robin Cotton, forensic lab director for Cellmark. Dr. Cotton first explained the basis and methodology for conducting forensic DNA analysis using the polymerase chain reaction (PCR) method of amplification and short tandem repeats (STR) as genetic markers.[4]

Dr. Cotton next testified to the results of Cellmark's analysis of the evidence in the instant case. DNA on each of the "do-rags" was consistent with Frederick Moore's at each of the nine loci tested. Within Moore's racial category, only one individual in 79 billion could be expected to exhibit that particular DNA profile. DNA obtained from the inside of the knife was consistent with that of Ashley Mason; DNA obtained from the outside of the knife came from multiple sources. Moore was identified as a possible contributor at six of the nine loci; the outside of the knife was inconclusive as to Brill. The fingernail clippings from Ashley Mason's right and left hands both revealed a mixture of DNA, with Ashley Mason identified as the primary source. There were also indications of a male as a possible source, but no further conclusion could be made. Swabs from Mason's left ankle showed a mixture of DNA, with no primary source. Brill was included as a possible source, while Moore was excluded as a source. Swabs from Mason's right ankle also revealed a mixture of DNA, with Mason herself as the primary source. The secondary DNA was inconclusive as to Moore and as to Brill, with both men included at four of the nine loci. The vaginal swabs yielded both sperm fractions and non-sperm fractions. The sperm fractions indicated the presence of male DNA, but no further conclusions could be drawn. Sperm fractions recovered from the anal swabs revealed that Moore could be included as a possible source at five of the nine loci; no conclusion could be reached on the remaining four loci.[5] A

---

4. We reviewed this methodology at some length in *Young v. State,* 388 Md. 99, 106–112, 879 A.2d 44, 48–52 (2005).

5. Moore was not charged with any sexual offense.

comparison with Scott Brill's DNA was inconclusive. Sperm fractions recovered from Mason's underwear revealed a mixture of at least two sources. Although no primary source was determined, Frederick Moore was included as a possible contributor at all nine loci. Within Moore's racial category, approximately one individual in 40,000 could have contributed these sperm fractions.

In addition to the DNA evidence, the State presented testimony from an acquaintance of Moore and Brill, Martise Stewart, from Scott Brill's sister, Crystal Brill, and from Moore's cousin and the mother of Brill's child, Danielle Ritter. According to Stewart, Ashley Mason arrived at Stewart's home in the company of Moore and Brill. An altercation broke out, first between Mason and Brill, then between Mason and both men. Stewart observed Brill punch Mason in the face, and then Moore remarked "[j]ust go ahead and hit the bitch, man. Hit her." Stewart went upstairs after this exchange, but heard "a lot of loud commotion" continue in the basement. Stewart later saw Mason leave with Moore and Brill. At this time, Moore was wearing a do-rag.

Some hours later, Moore and Brill returned to Stewart's house. Moore's "butter Timberland" boots were "like smudged with blood," and blood was smeared on the front of Moore's pants legs. His do-rag was missing. Stewart did not see any blood on Brill, but Brill had lacerations on both arms, "like he was in some kind of like tussle or something." Brill "indicated they killed her," and said that Mason had caused his lacerations by scratching him as he choked her. Moore "said they both had killed her and they put her behind the Pizza Hut on 108, or somewhere." [6] Moore also said that they had used a buck knife and that "he threw the knife and he couldn't find it." Moore told Stewart that "it was almost like

---

6. On cross-examination, Stewart acknowledged that in his grand jury testimony he had "probably" recounted only Brill confessing to the murder. But Stewart nonetheless maintained that both men had in fact confessed.

daylight outside, but he said he would've definitely recovered the weapon, but he couldn't, like, find where he threw it at."

Crystal Brill identified photographs of the knife found by the garbage collector as those of a knife she had bought for Moore at a flea market, and that she knew Moore to carry it in his pocket. Crystal Brill also identified the two do-rags found near Ashley's body as belonging to Moore, explaining that Moore wore two do-rags simultaneously because one had a "little rip." She recognized the same rip when the do-rags were shown to her in court. Crystal Brill testified that Moore wore butter-colored Timberland boots prior to the murder, but that she never saw him wear these boots after Ashley was killed. In addition, Crystal Brill testified that after the killing, she saw Moore wiping down the inside of the passenger door on Scott Brill's Ford Escort with a rag. Using a photo, Crystal pointed out the area that Moore had wiped down, which included the window handle. She had never before seen Moore wipe down the car in that fashion.

Danielle Ritter testified that some weeks after the murder, Moore had told her "what had happened." On direct examination, Ritter at first testified that Moore had told her Ashley "got killed" in a parking lot, but "didn't really say" who had killed her. After some prodding by the State, Ritter testified that Moore had said "we" killed her. On cross-examination, however, defense counsel asked Ritter "Freddy Moore never told you he stabbed Ashley, did he," and Ritter answered, "He don't say who stabbed her."

Petitioner was convicted of first degree murder and was sentenced to incarceration for his natural life. He noted a timely appeal to the Court of Special Appeals, which affirmed his conviction. *Moore v. State*, 154 Md.App. 578, 841 A.2d 31 (2004). Before that court, he argued, *inter alia*, that the trial court erred in denying his motion requesting funding for a DNA defense expert on the grounds of indigency when he had retained and financed private counsel. He argued that the trial court (and the Public Defender) violated his federal Constitutional rights to due process, equal protection of law,

and effective assistance of counsel, as well as Maryland's statutory framework providing legal aid to indigents.

The State argued that any statutory or Constitutional right to State funding for expert testimony was dependent upon indigency and that because Moore had retained private counsel, he could not be deemed indigent for any purpose. In addition, the State argued that Moore had failed to make the necessary showing in the trial court that he was indigent. The intermediate appellate court held that Moore was not indigent and was not entitled to State funding for the expert. The court stated as follows:

> "[Petitioner] paid to be represented by private counsel and did not seek representation through the public defender. Therefore, [petitioner] is not indigent and is foreclosed from requesting public funding for a DNA expert, either through the Public Defender's Office or the lower court. That is not to say that a defendant who proceeds with private counsel cannot later become indigent, apply for representation with the Public Defender, and avail himself or herself of the benefits of other necessary services such as an expert witness. We hold only that a defendant who pays for and retains private counsel throughout the adjudicatory process cannot be deemed indigent for purposes of obtaining a publically funded expert witness."

*Id.* at 592, 841 A.2d at 39.

The Court of Special Appeals also rejected Moore's constitutional arguments and concluded that the State had complied fully with the requirements of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The court reasoned that the evaluation of the samples giving rise to the DNA testimony in this case were "impartial, scientific and objective." *Moore*, 154 Md.App. at 598, 841 A.2d at 42. The court concluded that "the State provided expert analysis and any constitutional duty had ended after that point." *Id.*

## II.

Moore argues before this Court that the federal Constitutional guarantees of effective assistance of counsel, due pro-

cess of law, and equal protection of law include the right to a defense expert under the circumstances presented herein, without regard to whether an indigent defendant has private counsel. Relying on *Ake*, he argues that he is entitled to the "basic tools of an adequate defense" and that where, as here, DNA evidence is likely to be a significant factor, he should have been afforded expert assistance. He argues that the Court of Special Appeals was wrong in concluding that Dr. Cotton, the Cellmark expert, satisfied the State's Constitutional obligations. He asserts the Dr. Cotton did not assist with Moore's trial preparation of cross-examination and that Moore was at a distinct disadvantage and without an opportunity to prepare a defense in a case in which DNA was central to the prosecution's case. Moore also argues that the trial court and intermediate appellate court erred in holding that Moore was not entitled to expert assistance because he had private counsel. He maintains that he made the requisite showing under *Ake* that the issue of DNA would be a significant factor at trial and that he was prejudiced by the denial of these funds to secure an expert. Finally, Moore argues that he is entitled to expert funding at State expense pursuant to Md.Code (1957, 2003 Repl.Vol., 2004 Cum.Supp.), Art. 27A (governing the duties of the Public Defender).[7] He maintains that public funding of expert costs is available to indigent defendants in Maryland without regard to a defendant's relationship with counsel or upon accepting legal representation by the Public Defender.

The State contends initially that Moore bore the burden of establishing indigency but failed to do so. Assuming *arguendo* that Moore was indigent, the State argues that *Ake* is distinguishable from the instant case and does not compel the remedy sought by Moore. It further contends that any Constitutional right to the assistance of a DNA expert was satisfied by the State's disclosure to Moore of the Cellmark documents and reports during discovery.

---

7. Unless otherwise noted, all subsequent statutory references herein shall be to Md.Code (1957, 2003 Repl.Vol., 2004 Cum.Supp.) Art. 27A.

Even assuming that *Ake* could require the appointment of a State-funded DNA expert to an indigent defendant, the State argues that a defendant must establish that a substantial question exists requiring the testimony of a DNA expert or that the defense cannot be developed without expert assistance. It argues that Moore made only general allegations that a defense expert could potentially point out mistakes made by a government expert.

With respect to Moore's argument that he is entitled to funding under Art. 27A, the State contends that the statutory framework does not require the Public Defender to provide expert witness funding to a defendant represented by private counsel. Rather, the State argues, indigent defendants are obliged to seek legal representation by the Public Defender before they are entitled to ancillary services provided through the budget of the Office of the Public Defender (O.P.D.). Finally, the State contends that if there were any error in denying Moore's funding request, it was harmless.

## III.

### A. *Ake v. Oklahoma*

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court reversed the conviction and death sentence of an indigent defendant after the trial court denied his request for a state-funded psychiatric examination. The issue in *Ake* was "whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question." *Id.* at 70, 105 S.Ct. at 1089.

Ake was an indigent defendant, charged with first degree murder and shooting with the intent to kill. Before trial, his counsel represented to the court that Ake intended to present an insanity defense. He asked the court to arrange for a psychiatrist to examine the defendant with respect to his mental condition at the time of the offense, or to provide him with funds to enable the defense to arrange for such an

examination. The court denied this request. Consequently, Ake had no access to a psychiatrist. Based on Ake's bizarre behavior in the courtroom pre-trial, Ake was examined by State psychiatrists to assess his competency to stand trial. The court found Ake to be a "mentally ill person in need of care and treatment," incompetent to stand trial, and ordered him committed to the State mental hospital. Six weeks later he was found to be competent and ordered to stand trial. Although Ake had undergone extensive court-ordered psychiatric examination with regard to his competency to stand trial, he had never been examined by a psychiatrist with respect to his mental condition at the time of the killings. Ake had entered a plea of not guilty by reason of insanity; his sole defense was lack of criminal responsibility, a defense which, because of indigency, he was obliged to present without the aid of a psychiatric expert. At trial, there was no expert testimony for either side as to Ake's sanity at the time of the offense. *Id.* at 72, 105 S.Ct. at 1091. Although Ake's counsel called to the stand and questioned the State psychiatrists who had examined Ake prior to trial, none could testify as to Ake's mental state at the time of the offense, because none had examined him on that point. *Id.* The jury rejected Ake's insanity defense and found him guilty on all counts. *Id.* at 73, 105 S.Ct. at 1091.

The Supreme Court explained as follows:

"This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake."

*Id.* at 76, 105 S.Ct. at 1092.

"In recognition of this right," the Court stated, it had reached a series of decisions entitling indigents to various

services at state expense. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (effective assistance of counsel); *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (blood grouping tests in "quasi-criminal" paternity proceedings); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (assistance of counsel on first direct appeal as of right); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (assistance of counsel at trial); *Burns v. Ohio,* 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (waiver of Notice of Appeal filing fee); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (trial transcripts on appeal).

The Court further stated:

"Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.' To implement this principle, we have focused on identifying the 'basic tools of an adequate defense or appeal,' and we have required that such tools be provided to those defendants who cannot afford to pay for them."

*Ake,* 470 U.S. at 77, 105 S.Ct. at 1093 (citations omitted).

In determining whether due process demands a state-furnished psychiatrist under Ake's circumstances, the Court found several factors relevant: the private interest that will be affected by the action of the State, the governmental interest of the State that will be affected if the safeguard is to be provided, the probable value of the additional or substitute

procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Id.* at 77, 105 S.Ct. at 1093. Finding the defendant's interest in the accuracy of a criminal trial to be "almost uniquely compelling," the state's interest to be only economic, and the need for psychiatric assistance critical, the Court determined that due process had required provision of a psychiatrist to Ake. The Court reasoned as follows:

> "[W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination."

*Id.* at 82, 105 S.Ct. at 1096. The Court held as follows:

> "We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."

*Id.* at 83, 105 S.Ct. at 1096.

### B. The Scope of *Ake*

In the wake of *Ake,* several questions arise. *See generally* Paul C. Giannelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post–Daubert, Post–DNA World,* 89 Cornell L.Rev. 1305 (2004). These questions include whether *Ake* extends beyond the capital context, whether the right to expert assistance extends beyond the insanity context and to non-psychiatric experts, the nature of the assistance to which a defendant is entitled, and the threshold showing a defendant must make to trigger the right.

## 1. Application of *Ake* Beyond the Capital Context

Based on language in the concurring opinion of Chief Justice Burger in *Ake*, some courts have limited the application of *Ake* to capital cases. *See, e.g., Isom v. State*, 488 So.2d 12, 13 (Ala.Crim.App.1986); *Bannister v. State*, 726 S.W.2d 821, 828–30 (Mo.App.1987). Chief Justice Burger stated as follows:

> "The facts of the case and the question presented confine the actual holding of the Court. In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases. Nothing in the Court's opinion reaches non-capital cases."

*Ake* at 87, 105 S.Ct. at 1098 (Burger, C.J., concurring).

The majority of courts that have considered this question have concluded that *Ake* applies to non-capital cases. *See Cowley v. Stricklin*, 929 F.2d 640, 640 (11th Cir.1991); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir.1987); *Palmer v. State*, 486 N.E.2d 477, 481–82 (Ind.1985); *State v. Coker*, 412 N.W.2d 589, 592–93 (Iowa 1987); *State v. Dunn*, 243 Kan. 414, 758 P.2d 718, 724–25 (1988); *Pertgen v. State*, 105 Nev. 282, 774 P.2d 429, 430–31 (1989); *State v. Campbell*, 127 N.H. 112, 498 A.2d 330, 332–33 (1985); *People v. Stone*, 195 Mich.App. 600, 491 N.W.2d 628, 631–32 (1992); *State v. Barnett*, 909 S.W.2d 423, 427 (Tenn.1995); *Taylor v. State*, 939 S.W.2d 148, 152 (Tex.Crim.App.1996).

The Tennessee Supreme Court reasoned as follows:

> "We agree with the jurisdictions that have applied the *Ake* principle in the non-capital context because the due process principle of fundamental fairness requires that a State which prosecutes an indigent defendant assure that defendant of a fair opportunity to present his defense. It is axiomatic that fairness cannot exist where an indigent defendant is deprived by poverty of a meaningful opportunity to defend when his liberty is at stake. The due process principle of fundamental fairness applies to all criminal

prosecutions, and does not rest upon the severity of the sanction sought or imposed."

*Barnett,* 909 S.W.2d at 428.

■ We agree, and conclude that *Ake* extends beyond the capital context and applies to non-capital cases.

### 2. Application of *Ake* Beyond the Insanity / Psychiatric Context

The next question that arises is whether *Ake* is restricted to cases in which the defendant's sanity is at issue. The majority of courts have concluded that *Ake* extends beyond psychiatric experts. *See, e.g., Terry v. Rees,* 985 F.2d 283, 284 (6th Cir.1993) (pathologist); *Dunn v. Roberts,* 963 F.2d 308, 313 (10th Cir.1992) (battered-spouse syndrome expert); *Scott v. Louisiana,* 934 F.2d 631, 633 (5th Cir.1991) (ballistics expert); *Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir.1987) (hypnotism expert); *Ex parte Moody,* 684 So.2d 114, 118–19 (Ala.1996) (applicable to non-psychiatric experts generally); *Ex parte Dubose,* 662 So.2d 1189, 1194 (Ala.1995) (DNA expert); *Ex parte Sanders,* 612 So.2d 1199, 1201–02 (Ala.1993) (ballistics expert); *Prater v. State,* 307 Ark. 180, 820 S.W.2d 429, 439 (1991) (DNA expert); *Doe v. Superior Court,* 39 Cal.App.4th 538, 45 Cal.Rptr.2d 888, 892–93 (1995) (experts on battered spouse and post-traumatic stress syndromes); *Cade v. State,* 658 So.2d 550, 555 (Fla.Dist.Ct.App.1995) (DNA expert); *Bright v. State,* 265 Ga. 265, 455 S.E.2d 37, 50 (1995) (toxicologist); *Crawford v. State,* 257 Ga. 681, 362 S.E.2d 201, 206 (1987) (serologist, psychologist, survey expert); *Thornton v. State,* 255 Ga. 434, 339 S.E.2d 240, 240–41 (1986) (forensic dentist); *People v. Lawson,* 163 Ill.2d 187, 206 Ill.Dec. 119, 644 N.E.2d 1172, 1192 (1994) (fingerprint and shoe print experts); *James v. State,* 613 N.E.2d 15, 21 (Ind.1993) (blood spatter expert); *State v. Coker,* 412 N.W.2d 589, 593 (Iowa 1987) (expert to assist with intoxication defense); *State v. Carmouche,* 527 So.2d 307, 307 (La.1988) (fingerprint expert, serologist); *Polk v. State,* 612 So.2d 381, 393 (Miss.1992) (DNA expert); *State v. Huchting,* 927 S.W.2d 411, 419 (Mo.Ct. App.1996) (DNA expert); *People v. Tyson,* 209 A.D.2d 354,

618 N.Y.S.2d 796–97 (N.Y.App.Div.1994) (voiceprint expert); *State v. Bridges,* 325 N.C. 529, 385 S.E.2d 337, 339 (1989) (fingerprint expert); *State v. Moore,* 321 N.C. 327, 364 S.E.2d 648, 656–58 (1988) (pathologist, non-psychiatrist physician, fingerprint expert); *State v. Mason,* 82 Ohio St.3d 144, 694 N.E.2d 932, 944–45 (1998) (non-psychiatric experts generally); *Rogers v. State,* 890 P.2d 959, 966 (Okla.Crim.App.1995) (any expert necessary for adequate defense); *State v. Rogers,* 313 Or. 356, 836 P.2d 1308, 1315 (1992) (opinion polling expert); *State v. Edwards,* 868 S.W.2d 682, 697 (Tenn.Crim.App.1993) (DNA expert); *Taylor v. State,* 939 S.W.2d 148, 153 (Tex. Crim.App.1996) (DNA expert); *Rey v. State,* 897 S.W.2d 333, 338–39 (Tex.Crim.App.1995) (forensic pathologist).

The United States Supreme Court has not addressed this issue; in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Court did not rule explicitly on whether the state had an obligation to appoint other than a psychiatric expert for an indigent defendant. The Court denied the defendant's request for the appointment of a criminal investigator on the grounds that the defendant made no showing as to the reasonableness of his request and had only generally asserted a need. *Id.* at 323 n. 1, 105 S.Ct. at 2637 n. 1.

The United States Court of Appeals for the Eighth Circuit addressed the question and concluded that "there is no principled way to distinguish between psychiatric and non-psychiatric experts." *Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). The court focused the issue as follows:

"The question in each case must be not what field of science or expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.

* * *

Letrice Little demonstrated that an expert in hypnosis would have substantially aided his defense, and that the

denial of such expert would and did have a material impact on his trial."

*Id.* at 1243–44.

█ In balancing the interests of the parties, the Supreme Court reasoned that the defendant's interest is in "the accuracy of [the] criminal proceeding," and that "the host of safeguards fashioned . . . over the years to diminish the risk of erroneous conviction stands as a testament to that concern." *Ake* at 78, 105 S.Ct. at 1093. Wrongful convictions are not limited to cases involving psychiatric issues. Where the defendant's mental state excuses an otherwise criminal act, a psychiatrist often will be the relevant expert. But where the defendant's guilt turns on the interpretation of physical evidence within the competence of some other profession or learned field, an expert in that area may be no less indispensable. Accordingly, we join the vast majority of those jurisdictions having considered this issue and hold that the right announced in *Ake* is not limited to providing psychiatric experts. The principles enunciated in *Ake* apply in cases of non-psychiatric expert assistance when an indigent defendant makes the requisite showing that the requested assistance is needed for him or her to have "a fair opportunity to present his defense." *Ake,* 470 U.S. at 76, 105 S.Ct. at 1092.

### C. Establishment of the Right to Expert Assistance

#### 1. The Necessary Showing

█ We turn now to another issue left substantially unresolved in *Ake*—the level and specificity of the threshold showing a defendant must make to establish entitlement to expert assistance. Most courts that have considered the question of whether an indigent is entitled to public funded appointment of a non-psychiatric expert have applied the rationale expressed by the Supreme Court in *Ake.* Reading *Ake* and *Caldwell* together require that the State provide indigent defendants with the "basic tools of an adequate defense," *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093, and, when the required showing is made, require the appointment of non-psychiatric

experts. Due process and equal protection require the State to provide non-psychiatric experts to indigent defendants when the defendant makes a particularized showing of the need for assistance of such experts. *See, e.g., Little v. Armontrout,* 835 F.2d 1240, 1245 (8th Cir.1987); *Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.1987); *Kennedy v. State,* 578 N.E.2d 633, 640 (Ind.1991); *State v. Coker,* 412 N.W.2d 589, 593 (Iowa 1987); *Harrison v. State,* 635 So.2d 894, 902 (Miss.1994); *Polk v. State,* 612 So.2d 381, 393 (Miss.1992); *State v. Mills,* 332 N.C. 392, 420 S.E.2d 114, 117 (1992); *State v. Edwards,* 868 S.W.2d 682, 697 (Tenn.Crim.App.1993); *Rey v. State,* 897 S.W.2d 333, 343 (Tex.Crim.App.1995).

It is clear that *Ake* does not mandate handing over the State's checkbook to indigent defendants and their attorneys. The Supreme Court reiterated that it has never "held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)" but had rather "focused on identifying the 'basic tools of an adequate defense or appeal.'" *Ake* at 77, 105 S.Ct. at 1093 (quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971)). Significantly, the Court's holding in *Ake* was predicated on the defendant having "demonstrat[ed] to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Ake* at 83, 105 S.Ct. at 1096. Thus, in *Caldwell,* the Court terminated its inquiry when it found that "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell,* 472 U.S. at 323 n. 1, 105 S.Ct. at 2637 n. 1.

■■■ The test that seems to have been adopted by the majority of courts considering the issue is the one enunciated by the United States Court of Appeals for the Eleventh Circuit in *Moore v. Kemp,* 809 F.2d 702 (11th Cir.1987). The court concluded that *Ake* and *Caldwell* require that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the

defense and that denial of expert assistance would result in a fundamentally unfair trial. *Id.* at 712. The court explained as follows:

"[A] defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, such as insanity, he must demonstrate a substantial basis for the defense, as the defendant did in *Ake.* In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case."

*Id.* at 712.

We agree with this formulation, and join those courts that have adopted it. *See, e.g., Page v. Lee,* 337 F.3d 411, 416 (4th Cir.2003); *Williams v. Collins,* 989 F.2d 841, 845–46 (5th Cir.1993); *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1104 (6th

Cir.1990); *Little v. Armontrout*, 835 F.2d 1240, 1244 (8th Cir.1987); *Tyson v. Keane*, 991 F.Supp. 314, 324–25 (S.D.N.Y. 1998); *U.S. v. Ndanyi*, 45 M.J. 315, 319 (C.A.A.F.1996); *State v. Apelt*, 176 Ariz. 349, 861 P.2d 634, 651 (1993); *Crawford v. State*, 257 Ga. 681, 362 S.E.2d 201, 206 (1987); *Cade v. State*, 658 So.2d 550, 553 (Fla.Dist.Ct.App.1995); *State v. Touchet*, 642 So.2d 1213, 1216 (La.1994); *Taylor v. State*, 939 S.W.2d 148, 152 n. 3 (Tex.Crim.App.1996).

The manner in which the defendant may make this required showing will depend necessarily upon the purpose for which the defendant seeks the expert assistance. For example, if the defendant seeks an expert in order to confront the prosecution's proof, the defendant must inform the court how the expert would be useful in light of the prosecution's case. *Moore v. Kemp*, 809 F.2d at 712. This is not to say that a defendant must predict to a certainty every detail of the prosecution's theory, or display a highly sophisticated understanding of the contribution the requested expert would make to the defense. Defense counsel does have, however, an obligation to become informed of the specific scientific area in question in order to explain the necessity of any requested expert to the court. *Id.* at 712.

The analysis of whether a defendant has fulfilled this obligation will be a dynamic one, dependent on the amount of discovery received, the extent to which a likely prosecution theory is obvious, the complexity of the scientific or technical issues, and other case-specific factors. For example, the *Moore v. Kemp* court opined:

"In a jurisdiction ... which accords the defendant substantial discovery rights, the defendant should have no difficulty in demonstrating the theory of the government's case and outlining the evidence the prosecutor will probably present at trial. The difficulty of the defendant's task will vary depending on the scope of the jurisdiction's discovery rules. In a jurisdiction still employing 'trial by ambush,' the defendant might have to ask the court to make the prosecutor disclose the theory of his case and the results of any tests

that may have been performed by government experts or at the government's request."

*Moore v. Kemp,* 809 F.2d at 712 n. 10 (citations omitted).

## 2. Availability of *Ex Parte* Proceedings

The Supreme Court, in *Ake,* referred to an *ex parte* hearing, stating that "[w]hen the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." *Ake,* 470 U.S. at 82–83, 105 S.Ct. at 1096. Defendants may be required to reveal to the court the defense theory in order to demonstrate entitlement to expert assistance. A defendant may request that these disclosures be made *ex parte.* Paul C. Gianelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post–Daubert, Post–DNA World,* 89 Cornell L.Rev. 1305, 1338, 1402–1404 (2004); *see generally* Kimberly J. Winbush, *Right of Indigent Defendant in State Criminal Prosecution to* Ex Parte In Camera *Hearing on Request for State–Funded Expert Witness,* 83 A.L.R.5th 541 (2000).

Courts have split as to the necessity of *ex parte* hearings. Several states have statutes requiring an *ex parte* hearing when an indigent defendant requests appointment of an expert. *See, e.g.,* Minn.Stat. § 611.21 (2003); S.C. Stat. § 16–3–26(c) (2003); Tenn.Code Ann. § 40–14–207(b) (2003); Nev. Rev.Stat. Ann. § 7.135 (Michie 1998); N.Y. County Law § 722–c (Consol.1977).

The courts in Alabama, Arkansas, Florida, Georgia, Hawaii, Indiana, Michigan, Oklahoma, Tennessee, Texas, and Washington have held that an *ex parte* hearing is required. *See Ex parte Moody,* 684 So.2d 114, 120 (Ala.1996); *Wall v. State,* 289 Ark. 570, 715 S.W.2d 208, 209 (1986); *Brooks v. State,* 259 Ga. 562, 385 S.E.2d 81, 83–84 (1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); *Arnold v. Higa,* 61 Haw. 203, 600 P.2d 1383, 1385 (1979); *Stanger v. State,* 545 N.E.2d 1105, 1115 (Ind.App.1989); *People v. Loyer,* 169 Mich. App. 105, 425 N.W.2d 714, 722 (1988); *McGregor v. State,* 733

P.2d 416, 416–17 (Okla.Crim.App.1987); *Barnett,* 909 S.W.2d at 428; *Williams v. State,* 958 S.W.2d 186, 192–94 (Tex.Crim. App.1997); *State v. Newcomer,* 48 Wash.App. 83, 737 P.2d 1285, 1291 (1987).

The courts in Arizona, South Dakota, and Virginia have held that whether to hold an *ex parte* hearing is within the trial court's discretion. *See State v. Apelt,* 176 Ariz. 349, 861 P.2d 634, 650 (1993); *State v. Floody,* 481 N.W.2d 242, 254–56 (S.D.1992); *Ramdass v. Commonwealth,* 246 Va. 413, 437 S.E.2d 566, 571 (1993), *vacated on other grounds,* 512 U.S. 1217, 114 S.Ct. 2701, 129 L.Ed.2d 830 (1994). Louisiana requires an indigent defendant to show that he or she would be prejudiced if the hearing was not held *ex parte. State v. Touchet,* 642 So.2d 1213, 1220 (La.1994). The North Carolina Supreme Court has held that an *ex parte* hearing is required when the request is for a psychiatrist, *State v. Ballard,* 333 N.C. 515, 428 S.E.2d 178, 180 (1993), but not required when the request is for a non-psychiatric expert. *State v. Phipps,* 331 N.C. 427, 418 S.E.2d 178, 190–91 (1992).

■ We believe the better view is that an *ex parte* hearing, when timely requested, is required. *See generally* Justin B. Shane, *Money Talks: An Indigent Defendant's Right to an* Ex Parte *Hearing for Expert Funding,* 17 Cap. Def. J. 347 (2005); Giannelli, *supra,* at 1403–04. Indigent defendants seeking state funded experts should not be required to disclose to the State the theory of the defense when non-indigent defendants are not required to do so. *See, e.g., Barnett,* 909 S.W.2d at 428 (holding that "[i]ndigent defendants who must seek state-funding to hire a[n] ... expert should not be required to reveal their theory of defense when their more affluent counterparts, with funds to hire experts, are not required to reveal their theory of defense.")

In *Moody,* the Alabama Supreme Court discussed this issue as follows:

"Requiring an indigent defendant to prematurely disclose evidence in a hearing where the state is present encroaches on the privilege against self-incrimination, which applies at

all stages of a criminal proceeding. The privilege against self-incrimination 'does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.' *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975).

There should be equality between 'indigents and those who possess the means to protect their rights.' *United States v. Tate*, 419 F.2d 131 (6th Cir.1969). An indigent defendant should not have to disclose to the state information that a financially secure defendant would not have to disclose."

*Moody*, 684 So.2d at 120. We agree.

### IV. Article 27A and State Funding of Experts

Before considering whether the State had a constitutional duty to fund Moore's request, we must address Moore's contention that it had a statutory duty to do so through the O.P.D. Moore contends that Art. 27A, which governs the powers and responsibilities of the Office of the Public Defender, mandated that the Public Defender fund his request even though he was not a client of the O.P.D. We must resolve whether Article 27A requires the O.P.D. to provide the services petitioner requests without concomitant representation by the Office. The State contends that Art. 27A should be read to provide that the duty of the Public Defender to provide "related necessary services" connected with representation of indigents need be furnished to an indigent defendant only if the O.P.D. is representing that defendant.

The General Assembly of Maryland, in setting up the O.P.D., declared that it was establishing that agency with the policy and legislative intent to provide for representation of indigents in criminal and juvenile proceedings, including related necessary services and facilities. Art. 27A § 1. "Indigent" is defined as follows:

" 'Indigent' means any person taken into custody or charged with a serious crime … who under oath or affirmation subscribes and states in writing that he is financially unable, without undue hardship, to provide for the full payment of an attorney and all other necessary expenses of legal representation."

Art. 27A § 2. Art. 27A § 4(a), sets out the duty of the O.P.D. to provide legal representation as follows:

"It shall be the primary duty of the Public Defender to provide legal representation for any indigent defendant eligible for services under this article. Legal representation may be provided by the Public Defender, or, subject to the supervision of the Public Defender, by his deputy, by district public defenders, by assistant public defenders, or by panel attorneys as hereinafter provided for."

Eligibility for the services of the O.P.D. is determined on the basis of the need of the defendant. Art. 27A § 7(a). The reasonable value of any services rendered to a defendant pursuant to Art. 27A constitutes a lien on real and personal property in which the defendant has or acquires an interest in, excluding his or her residence. Art. 27A § 7(d).

The statute is silent as to whether representation by the O.P.D. and ancillary services are severable. The Court of Special Appeals addressed this issue and held that "the dual services provided by the public defender are not severable." *Moore*, 154 Md.App. at 592, 841 A.2d at 39. The intermediate appellate court explained as follows:

"We agree with those states which hold that the dual services provided by the public defender are not severable. The language of Art. 27A § 2, defining indigent as a person unable 'to provide for the full payment of a attorney and all other necessary expenses of legal representation,' is a unified enactment and does not contemplate that a defendant could be indigent for purposes of 'all other necessary expenses' and yet able to retain private counsel. We adopt Kentucky's position that, '[u]nder this definition and the general tenor of the entire Act, inability to obtain counsel

and inability to obtain necessary services go hand in hand.'
Thus, any funding for the necessary services associated with
representation are conditioned upon representation by the
Public Defender."

*Moore,* 154 Md.App. at 592, 841 A.2d at 39 (citations omitted).

■ We agree with the Court of Special Appeals and hold
that the O.P.D. is not required to pay for expert assistance or
other ancillary services if the defendant is not represented by
the O.P.D. (or a panel attorney assigned by the O.P.D.). The
operative part of the statutory definition of "indigent" con-
tained in Art. 27A is that the defendant is financially unable,
without undue hardship, to provide for the *full payment of an
attorney* and all other necessary expenses of legal representa-
tion. The services provided by the O.P.D. are not severable.
In order for the defendant to qualify for the benefits provided
under the Act and thereby require the O.P.D. to pay for
services, the defendant must be without independent means to
obtain counsel.

V. Satisfaction of Moore's *Ake* Rights in the Instant Case

A. Provision of Expert Services Through the O.P.D.

The bottom line question in this case is whether the State
has satisfied its constitutional obligations by establishing the
O.P.D., making expert services available to clients of that
Office, and requiring that, in order for an indigent to receive
State-funded expert services, the defendant *must* seek repre-
sentation by O.P.D. We conclude that the State has not
deprived petitioner of any of his constitutional rights by
requiring that he apply to the O.P.D. for representation before
he is entitled as an indigent to State funded expert witness
services. The Supreme Court contemplated in *Ake* that
States could place restrictions on indigent defendants' access
to state-funded expert services. The Court stated as follows:

"This is not to say, of course, that the indigent defendant
has a constitutional right to choose a psychiatrist of his
personal liking or to receive funds to hire his own. Our
concern is that the indigent defendant have access to a

competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right."

*Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. Thus, while a State might provide funds enabling indigent defendants with retained counsel to hire experts of their own choosing, *Ake* does not require this approach.

Moore is correct that, if he is indigent, he has a right under *Ake* to state-paid supporting services necessary to an adequate defense.[8] As we have indicated, *supra,* Maryland has established a State-wide public defender system which provides legal representation, investigative services, and expert assistance to persons deemed indigent under Art. 27A § 2. In 1971, the Legislature created the Office of the Public Defender. *See* 1971 Md. Laws, Ch. 209 at 486–94. The purpose of the statutes creating that agency was set forth as follows:

"It is hereby declared to be the policy of the State of Maryland to provide for the realization of the constitutional guarantees of counsel in the representation of indigents, *including related necessary services and facilities,* in criminal and juvenile proceedings within the State, and to assure effective assistance and continuity of counsel to indigent accused taken into custody and indigent defendants in criminal and juvenile proceedings before the courts of the State of Maryland, and to authorize the Office of Public Defender to administer and assure enforcement of the provisions of this article in accordance with its terms."

Art. 27A § 1 (emphasis added).

*State v. Miller,* 337 Md. 71, 651 A.2d 845 (1994), is instructive on the question of whether the State may condition the receipt of constitutionally mandated services on representation by the O.P.D. The indigent petitioner in that case, Bernard Miller, had been convicted at trial of kidnapping, robbery, murder, and other related offenses. On appeal, as at trial, he

---

**8.** We do not reach the question of whether Moore made the required showing, as discussed *supra,* that the services he requested were in fact necessary to an adequate defense.

was represented by private counsel on a *pro bono* basis. Miller had refused the representation of the O.P.D., and further refused to permit his attorney to seek appointment as an assigned public defender and thereby submit to the supervision of the O.P.D. Had Miller's counsel taken this step, the O.P.D. would have borne the costs of obtaining a stenographic transcript of the trial proceedings. *Id.* at 74–75, 651 A.2d at 846.

Miller filed in the Circuit Court a motion requesting that the court furnish a transcript without charge. The Circuit Court denied the motion on the grounds that Md. Rule 1–325(b) required the court to pay for a transcript only where a party was eligible for O.P.D. representation, had applied to the O.P.D., and had been declined representation by that agency. *Id.* at 75, 651 A.2d at 846.

On appeal, Miller argued that the requirement that he be represented by, or denied representation by, the O.P.D. before receiving a free transcript violated his rights to equal protection and assistance of counsel. We affirmed the Circuit Court. After ruling that the court had correctly interpreted Md. Rule 1–325(b), we noted that under *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from foreclosing all opportunity for appellate review by refusing, based solely on a defendant's indigence, to provide a trial transcript. But we also noted that Justice Black, in his plurality opinion, stated, "We do not hold, however, that Illinois must purchase a stenographer's transcript in every case where a defendant cannot buy it. The [Illinois] Supreme Court may find other means of affording adequate and effective appellate review to indigent defendants." *Id.* at 20, 76 S.Ct. at 591.

We then noted that "[a]llowing the states to create reasonable alternative systems by which the constitutional rights of indigents would be protected is a concept that has been applied to other rights of indigent defendants as well." *Mil-*

*ler,* 337 Md. at 83, 651 A.2d at 850. With respect to equal protection, we concluded as follows:

> "Miller *is* entitled to a free transcript, but he cannot receive it on his own terms; he must go through the Office of the Public Defender. The State is free to place reasonable restrictions on the exercise of Miller's rights, and Rule 1–325(b) is neither arbitrary nor unreasonable in its language or application. There can be no equal protection violation when an individual is denied a right simply because of his own failure to comply with reasonable state procedures and regulations."

*Miller,* 337 Md. at 85–86, 651 A.2d at 852.

Turning to Miller's Sixth Amendment claim, we noted that the Supreme Court has held that although an indigent criminal defendant enjoys the right to assistance of counsel, this entitlement does not translate into an absolute right to counsel of the defendant's choosing. *Id.* at 86–87, 651 A.2d at 852; *see Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) ("the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers"); *accord Fowlkes v. State,* 311 Md. 586, 605, 536 A.2d 1149, 1159 (1988) ("for indigent defendants ... the right to counsel is but a right to effective legal representation; it is not a right to representation by any particular attorney"). We concluded as follows:

> "Failure to provide a free transcript to the indigent appellant cannot interfere with the right to choice of counsel where no such absolute right exists. In the absence of such a right to choice of counsel, there is no constitutional violation when the State requires that an indigent defendant avail himself of the services of the Office of the Public Defender in order to obtain a free transcript.
>
> The State has set up a system by which all indigent appellants are provided effective assistance of counsel, whether represented by the Public Defender's Office or by a

private attorney under the supervision of that office. Miller cannot pick and choose which of the State-provided services he wishes to receive; he must accept the available resources as provided under Art. 27A and the Maryland Rules. Miller has not been denied his right to assistance of counsel, because he may apply to the Office of the Public Defender and receive effective representation. The Public Defender system is Maryland's 'alternative solution' as described in *Griffin* and *Bounds* [*v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ], *supra.* Public Defender representation, like a transcript, is part of the 'package' provided by the State, and requiring Miller to comply with reasonable State procedures in no way infringes upon his right to assistance of counsel."

*Miller,* 337 Md. at 87–88, 651 A.2d at 853. The United States Court of Appeals for the Fourth Circuit, sitting *en banc,* agreed with our holding on federal habeas corpus review. *Miller v. Smith,* 115 F.3d 1136 (4th Cir.1997) (*en banc* ), *cert. denied sub nom. Miller v. Corcoran,* 522 U.S. 884, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997).

 Our holding in *Miller* governs the outcome of the case *sub judice.* Although the Maryland Rules contain no analogue to Md. Rule 1–325(b) with respect to the appointment of experts, the practical effect of nonseverable O.P.D. services under Art. 27A is the same. Indigent defendants may utilize the O.P.D.'s complete "package" of services, or forgo them entirely. While such defendants may face difficult choices, the Constitution does not bar the State of Maryland from requiring them to choose between counsel of their choice and ancillary services provided by the O.P.D.

Assuming *arguendo* that the assistance of a DNA expert was necessary to an adequate defense in the instant case, the State did not deny Moore that assistance. Rather, expert assistance was available to him so long as he complied with the procedural requirement that he apply for legal representation through the O.P.D. Imposing this requirement on Moore did not violate his constitutional rights. *See Wheat,* 486 U.S. at

159, 108 S.Ct. at 1697; *Bounds v. Smith*, 430 U.S. 817, 830, 97 S.Ct. 1491, 1499, 52 L.Ed.2d 72 (1977); *Fowlkes*, 311 Md. at 605, 536 A.2d at 1159.

## B. Insufficiency of Discovery and Cross–Examination Alone

Although we affirm the judgment of the Court of Special Appeals, we disagree with one significant aspect of its opinion. The intermediate appellate court agreed with the State's contention that Moore's constitutional rights were satisfied by the State's disclosure of the Cellmark documents and reports during discovery. The court stated as follows:

"[T]here is nothing to indicate that Cellmark's evaluation of the samples was not impartial, scientific, and objective. Additionally, appellant's counsel was provided with all the DNA documents and reports generated by Cellmark prior to trial in order to prepare a defense. Thus, the State provided expert analysis and any constitutional duty had ended after that point."

*Moore v. State*, 154 Md.App. 578, 598, 841 A.2d 31, 42 (2004).

The intermediate appellate court based its holding in part on *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982), in which we held that a defendant found by the trial court to be competent to stand trial following a court-ordered evaluation by psychiatrists at a State hospital was not entitled to a private psychiatrist of his own choosing to assist in his defense at State expense. *Id.* at 415, 439 A.2d at 549. We stated as follows:

"Here, Johnson was evaluated by a team of independent psychiatric experts, he was furnished with copies of the resulting reports prepared by the examiners, and he had the opportunity to subpoena and question at trial members of the examining team. Whatever the amount of required State assistance for the appointment of defense experts to enable the indigent to place this issue of insanity before the trial court, we need not determine here, for it is certain that once an accused is evaluated by state funded, impartial and competent psychiatrists, that constitutional duty, if any, ends. '[T]he State has no constitutional obligation to pro-

mote a battle between psychiatric experts by supplying defense counsel with funds wherewith to hunt around for other experts who may be willing, as witnesses for the defense, to offer the opinion that the accused is criminally insane.' "

*Id.* (Citations omitted).

In light of *Ake,* decided three years after *Johnson,* it appears to us that our holding in *Johnson* has been overruled implicitly to the extent it suggests that the report of a State-employed expert who does not "assist in evaluation, preparation, and presentation of the defense" would be constitutionally sufficient.

We find numerous passages from *Ake* supportive of the proposition that due process requires the provision of a defense expert. We find the following language particularly revealing:

"We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination *and assist in evaluation, preparation, and presentation of the defense.*"

*Ake,* 470 U.S. at 83, 105 S.Ct. at 1096 (emphasis added).

"[T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists ... *know the probative questions to ask of the opposing party's* psychiatrists and how to interpret their answers."

Id. at 80, 105 S.Ct. at 1095 (emphasis added);

"[T]he psychiatrists *for each party* enable the jury to make its most accurate determination of the truth on the issue before them."

*Id.* at 81, 105 S.Ct. at 1095.

"[W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense,

to help determine whether the insanity defense is viable, to present testimony, *and to assist in preparing the cross-examination of a State's psychiatric witnesses,* the risk of an inaccurate resolution of sanity issues is extremely high."

*Id.* at 82, 105 S.Ct. at 1096 (emphasis added);

"[E]xperts are often necessary both for prosecution and for defense. . . . [A] defendant may be at an unfair disadvantage, if he is unable because of poverty to parry by his own witnesses the thrusts of those against him."

*Id.* at 82 n. 8, 105 S.Ct. at 1095 n. 8 (quoting *Reilly v. Berry,* 250 N.Y. 456, 166 N.E. 165, 167 (1929) (Cardozo, C.J.)).

The weight of authority among courts that have considered the issue suggests that the services of a defense expert are required. *See, e.g., Powell v. Collins,* 332 F.3d 376, 392 (6th Cir.2003); *Starr v. Lockhart,* 23 F.3d 1280, 1291 (8th Cir. 1994); *Cowley v. Stricklin,* 929 F.2d 640, 644 (11th Cir.1991); *Smith v. McCormick,* 914 F.2d 1153, 1156–59 (9th Cir.1990); *United States v. Sloan,* 776 F.2d 926, 929 (10th Cir.1985); *Buttrum v. Black,* 721 F.Supp. 1268, 1312–13 (N.D.Ga.1989); *Lindsey v. State,* 254 Ga. 444, 330 S.E.2d 563, 566–67 (1985); *People v. Lawson,* 163 Ill.2d 187, 206 Ill.Dec. 119, 644 N.E.2d 1172, 1192 (1994); *Binion v. Commonwealth,* 891 S.W.2d 383, 386 (Ky.1995); *Polk v. State,* 612 So.2d 381, 394 (Miss.1992); *State v. Gambrell,* 318 N.C. 249, 347 S.E.2d 390, 395 (1986); *De Freece v. State,* 848 S.W.2d 150, 159 (Tex.Crim.App.1993). *Contra, Granviel v. Lynaugh,* 881 F.2d 185, 191 (5th Cir.1989) (holding that a court-appointed psychiatrist, whose opinion and testimony is available to both sides, satisfies the defendant's rights"); *Commonwealth v. Reid,* 537 Pa. 167, 642 A.2d 453, 457 (1994) (finding *Ake* satisfied when trial court offered indigent defendant the "opportunity to be examined by a neutral court-appointed psychiatrist"); *see also People v. Leonard,* 224 Mich.App. 569, 569 N.W.2d 663, 671 (1997) (trial court's refusal to appoint DNA expert did not deny defendant effective assistance of counsel where defense attorney—who had undergraduate degree in chemistry—"effectively and comprehensively cross-examined the prosecution's experts" after

receiving discovery of all documents relating to DNA analysis in the case).

In his comprehensive and thoroughly researched law review article, Professor Paul Giannelli addresses this issue as follows:

"Appellate courts often cite the fact that the cross-examination of the prosecution expert was effective as a reason why a defense expert was not needed.

\* \* \*

First, the same reasoning applies when prosecutors seek a psychiatric evaluation of an accused who has raised an insanity defense . . . and yet virtually every jurisdiction has procedures recognizing the prosecution's right to have the accused examined by a state psychiatrist—a prosecution expert. The rationale for this procedure is obvious: the adversary system would be undermined if the prosecution was deprived of its own expert.

Second, effective cross-examination of a prosecution expert frequently requires the advice of a defense expert. . . .

Third, there is a significant difference between attacking the opinion of an opponent's expert through cross-examination and attacking that opinion through the testimony of your own expert. In *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993) ] the Supreme Court noted that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' In 1983, the Court upheld the admissibility of expert testimony concerning future dangerousness in capital cases. In so ruling, the Court noted that 'jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.' Similarly, the 1992 report of the National Academy of Sciences observed that '[m]ere cross examination by a

defense attorney inexperienced in the science of DNA testing will not be sufficient.' . . .

Finally, if this factor is relevant at all, it would only be so on appellate review under a harmless error analysis. After all, a trial court cannot wait to review the defense counsel's cross-examination before appointing a defense expert."

Paul C. Giannelli, *Ake v. Oklahoma: The Right to Expert Assistance in a Post–Daubert, Post–DNA World,* 89 Cornell L.Rev. 1305, 1376–78 (2004) (citations omitted).

When a defendant has made the threshold showing described *supra,* the State must, at a minimum, assure the defendant access to a defense expert who will assist in evaluation, preparation, and presentation of the defense. We reject the holding of the Court of Special Appeals—relied upon by the State before this Court—that Moore's *Ake* rights were satisfied by discovery and the opportunity to cross-examine Dr. Cotton. The State satisfied the Due Process Clause, as interpreted in *Ake,* by making expert assistance available to Moore through the O.P.D., conditioned on representation by that agency.

## VI. Exclusion of Evidence Regarding Scott Brill's Alleged Prior Acts of Violence

Moore also contends that the Circuit Court erred in precluding him from introducing evidence of Scott Brill's history of violence by cross-examining State's witnesses Crystal Brill and Danielle Ritter about Scott Brill's alleged assaults against them. The trial court excluded this evidence on the grounds that such evidence constituted other crimes evidence and was therefore inadmissible under Md. Rule 5–404(b). Moore contends that evidence of Brill's history of violence towards women made it more likely that Brill—rather than Moore, who had no such history—had killed Mason. We disagree.

Crystal Brill testified on behalf of the State. On cross-examination, to show Brill's pattern of violence, Moore's counsel asked if her brother, Scott Brill, had assaulted her. The State objected on the ground that the evidence was inadmissi-

ble as evidence of other crimes. The trial court sustained the objection. Danielle Ritter also testified as a State's witness. On cross-examination, Moore's counsel asked "Do you know if Scott Brill—does Scott Brill ever get angry with you and hit you?" The State again objected on the grounds that the evidence was inadmissible as evidence of other crimes. The trial court again sustained the objection.

Moore argues the evidence was admissible because it was relevant, and not excluded by Md. Rule 5–404(b). Moore is correct that the State's "other crimes" objection was misplaced. The ban contained in Md. Rule 5–404(b) on "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith" applies only to the acts of the defendant, not those of other persons. *See Sessoms v. State,* 357 Md. 274, 284, 744 A.2d 9, 15 (2000). Md. Rule 5–404(b) was not a proper basis to exclude the evidence, assuming it was relevant.

We do not agree with petitioner, however, that the evidence was admissible. Even if Brill had a propensity of violence towards women, it would not make it more likely, or less likely, that Brill committed the murder alone. It was always the State's theory of the case that Brill and Moore had acted together in killing Mason. The evidence was not relevant; thus, the trial court did not abuse its discretion in excluding it. Evidence that is not relevant is not admissible. *See* Md. Rule 5–402.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.***

BELL, C.J., dissents.

Dissenting Opinion by BELL, C.J.

The issue in this case is the applicability of the holding in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), regarding State funding of experts and expert-related services, to non-psychiatric experts and in the non-capital context, and, if it does apply to those situations, how the

threshold determination is made and of what does it consist? After extensive review and discussion of the Supreme Court's opinion in *Ake*, the majority concludes that the right to State-funded defense experts is a constitutional right, *Moore v. State*, 390 Md. 343, 382–84, 889 A.2d 325, 347–49 (2005) grounded in due process. 390 Md. at 380–81, 889 A.2d at 346–47.

The majority concludes that the principles enumerated in *Ake* apply in the non-capital context, 390 Md. at 363–64, 889 A.2d at 336–37, and in cases involving non-psychiatric experts, 390 Md. at 403–06, 889 A.2d at 361–62. As to the threshold showing required, it is, the majority holds, "that there exists a reasonable probability [1] both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." 390 Md. at 403–06, 889 A.2d at 339–40. Except for the level of the required showing, I am in general agreement on these points.

Although concluding that there is a right to State-funded expert services, the majority accepts the Court of Special Appeals' holding that Moore's *Ake* rights—his entitlement to State-funded expert services—were satisfied. This is so, the majority says, because the Office of the Public Defender ("OPD") will provide these services, so long as he is represent-

---

1. I do not agree that the threshold burden is so high; rather, I believe it to be "reasonable possibility." I believe that, by analogy, the standard articulated by this Court in *Dorsey v. State* to determine whether improperly admitted evidence contributed to a conviction applies. 276 Md. 638, 350 A.2d 665 (1976) (holding that the reviewing court must thus be satisfied that there is no reasonable possibility that evidence complained of, whether erroneously admitted or excluded, may have contributed to rendition of guilty verdict). *See also Yorke v. State*, 315 Md. 578, 556 A.2d 230 (1989) (in regards to newly discovered evidence, favoring a standard that falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable, and establishing that the inquiry is whether there is a "possibility that the verdict of the trier of fact would have been affected") (emphasis added); *Gross v. State*, 371 Md. 334, 347, 809 A.2d 627, 635 (2002) (holding regarding Sixth Amendment prejudice, "[i]f there is no reasonable possibility that the appellate court would have ruled in his favor, there can be no *Strickland* prejudice").

ed by an OPD attorney. 390 Md. at 374, 889 A.2d at 343. This conclusion is dictated, it submits, by *State v. Miller,* 337 Md. 71, 651 A.2d 845 (1994) and the Public Defender statute, Md.Code (1957, 2003 Repl.Vol., 2004 Cum.Supp.), Art. 27A. I disagree with this conclusion.

### A.

In *Miller,* the defendant Bernard Miller ("Miller") was convicted of murder. His *pro bono,* private counsel filed an appeal and, to prepare for that appeal, requested that a transcript of the trial proceedings be furnished to him free of charge. He relied on *Griffin v. Illinois,* 351 U.S. 12, 18–19, 76 S.Ct. 585, 590–591, 100 L.Ed. 891, 898–899 (1956), which held that a state could not refuse to provide a transcript solely on the basis of the defendant's indigency. Not wanting the OPD involved in any way, Miller did not seek and, indeed, refused to request, representation by the OPD. His attorney also did not seek appointment as an "assigned public defender" to represent Miller on appeal with the supervision of the OPD and would have refused such an appointment. 337 Md. at 74, 651 A.2d at 846. Relying on Maryland Rule 1–325(b),[2] the Circuit Court for Howard County denied the request.

---

2. Maryland Rule 1–325(b) provides:

"(a) *Generally.* A person unable by reason of poverty to pay any filing fee or other court costs ordinarily required to be prepaid may file a request for an order waiving the prepayment of those costs. The person shall file with the request an affidavit verifying the facts set forth in that person's pleading, notice of appeal, application for leave to appeal or request for process, and stating the grounds for entitlement to the waiver. If the person is represented by an attorney, the request and affidavit shall be accompanied by the attorney's signed certification that the claim, appeal, application, or request for process is meritorious. The court shall review the papers presented and may require the person to supplement or explain any of the matters set forth in the papers. If the court is satisfied that the person is unable by reason of poverty to pay the filing fee or other court costs ordinarily required to be prepaid and the claim, appeal, application, or request for process is not frivolous, it shall waive by order the prepayment of such costs.

"(b) *Appeals Where Public Defender Representation Denied—Payment by State.* The court shall order the State to pay the court costs

The Court of Special Appeals reversed. *Miller v. State*, 98 Md.App. 634, 635 A.2d 1 (1993). That court construed Rule 1–325(b) as applicable to the exact situation that Miller faced; it held: "where an indigent appellant who otherwise would qualify for representation by the Public Defender chooses to be represented by a qualified private attorney and that attorney elects to represent the appellant without fee of any kind or from any person, strictly on a *pro bono* basis, the Public Defender is obliged to provide the necessary transcript and . . . pay the cost of the brief and other necessary documents as well." *Id.* at 645, 635 A.2d at 6.

We granted the state's petition for certiorari. In this Court, the State argued that, while Miller was entitled to a free transcript, he must comply with Rule 1–325(b), Maryland's "method" of supplying indigent defendants with trial transcripts, believing it to be a reasonable exercise of an indigent's right to appeal. Miller, on the other hand, contended that *Griffin* mandated that he receive a free transcript and that Rule 1–325(b) denied him his Sixth Amendment right to assistance of counsel. This Court reversed the judgment of the Court of Special Appeals. Siding with the State, it held that an indigent defendant who had not sought, nor been refused, representation by the OPD was not entitled to a free State-funded trial transcript.

Analyzing the applicability of Rule 1–325(b), the Court traced the Rule from its historical root, Ch. 1068 of the Acts of 1945, codified as Maryland Code (1939, 1947 Cum.Supp.), Art. 5, § 88A, which required the State to prepare a transcript for indigent appellants in capital criminal cases, to its amendment to comply with the *Griffin* mandate, Ch. 68 of the Acts of 1958, codified as Md.Code (1957, 1963 Cum.Supp.) Art. 5,

---

related to an appeal or an application for leave to appeal and the costs of preparing any transcript of testimony, brief, appendices, and record extract necessary in connection with the appeal, in any case in which (1) the Public Defender's Office is authorized by these rules or other law to represent a party, (2) the Public Defender has declined representation of the party, and (3) the party is unable by reason of poverty to pay those costs."

§ 15A, to the promulgation of its predecessor, Maryland Rule 883 b (1958). *State v. Miller,* 337 Md. 71, 77, 651 A.2d 845, 847 (1994). We also focused on the legislative history of the Public Defender statute and of Rule 1–325(b). The latter focus was primarily on language in the minutes of the Rules Committee, which added the requirement that the OPD refuse representation before providing a free transcript to indigent defendants so as to "avoid abuse of the Rule by defendants attempting to do an end run around the Public Defender's Office." Rules Committee March 14–15, 1986, Minutes at 50. Those minutes reflected that the Committee questioned whether a rule requiring OPD refusal of representation as a condition for obtaining a free transcript would be constitutional, wondering particularly how such a rule would work when an indigent defendant had *pro bono* counsel or wanted to proceed *pro se.* The Chief Attorney of the Public Defender's Office responded:

"The proposed rule would not be an obstacle to the indigent appellant who wants to proceed with *pro bono* counsel. It has been the practice of the Public Defender's Office to cooperate with individual attorneys, law schools and other organizations willing to provide *pro bono* representation to indigent appellants. This cooperative arrangement has not presented problems in the past."

Memorandum from Dennis M. Henderson, Chief Attorney, Appellate Division, Office of the Public Defender, to Julia M. Freit, Reporter, Rules Committee, p. 6 (June 10, 1986).

Unlike the Court of Special Appeals, which had construed the "cooperation" described in the memorandum to mean that the OPD not object to providing a free transcript to indigent defendants who wished to proceed with *pro bono* counsel, 98 Md.App. at 645, 635 A.2d at 6, this Court interpreted the words, "cooperative arrangement," to mean that the OPD would work together with *pro bono* counsel and make arrangements for the provision of the free transcript. 337 Md. 71, 80–81, 651 A.2d 845, 849. We viewed Rule 1–325(b) as extending the framework of Art. 27A by identifying the OPD as the "gatekeeper" against abuse of State resources, 337 Md. 71, 81,

651 A.2d 845, 849–850, and as furthering the legislative goals of effective indigent representation by setting up the OPD as an "evaluator" of attorney competency:

> "The instant case demonstrates vividly how the legislative will can be frustrated by an indigent who for unspecified reasons has adamantly refused to cooperate in any way with the Public Defender. Md. Rule 1–325(b) expressly prevents such non-cooperation, which could lead to an appeal ineffectively conducted and a further expenditure of funds for a second appeal."

337 Md. at 81–82, 651 A.2d at 850. Thus, this Court concluded, Rule 1–325(b) required, as a condition for receiving a free trial transcript, that an indigent defendant apply for representation from the OPD. *Id.* at 82, 651 A.2d at 850. That condition did not constitute a difference based on his economic status, noting that it "depends on [Miller's] willingness to cooperate and follow the reasonable procedures set forth in Art. 27A and the Maryland Rules. But for his intransigence, this system would work, and Miller would receive a free transcript." *Id.* at 85, 651 A.2d at 851. Therefore, Miller was not receiving an unequal type of appeal. There was no *Griffin* violation.

The Court rejected Miller's Sixth Amendment argument. It reasoned that indigent defendants did not have an absolute right to counsel of choice; the Sixth Amendment provided for the right to effective representation, and not the right to representation by a particular attorney. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140, 148 (1988). This Court stated:

> "Failure to provide a free transcript to the indigent appellant cannot interfere with the right to choice of counsel where no such absolute right exists. In the absence of such a right to choice of counsel, there is no constitutional violation when the State requires that an indigent defendant avail himself of the services of the Office of the Public Defender in order to obtain a free transcript."

"The State has set up a system by which all indigent appellants are provided effective assistance of counsel, whether represented by the Public Defender's Office or by a private attorney under the supervision of that office. Miller cannot pick and choose which of the State-provided services he wishes to receive; he must accept the available resources as provided under Art. 27A and the Maryland Rules. Miller has not been denied his right to assistance of counsel, because he may apply to the Office of the Public Defender and receive effective representation. The Public Defender system is Maryland's 'alternative solution' as described in *Griffin* and *Bounds [v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).] Public Defender representation, like a transcript, is part of the 'package' provided by the State, and requiring Miller to comply with reasonable State procedures in no way infringes upon his right to assistance of counsel."

*Miller,* 337 Md. at 87–88, 651 A.2d at 853.

In the case *sub judice,* the majority extends *Miller* to the broad spectrum of ancillary services, not heretofore addressed, on the basis of attorney status and the non-severability of OPD representation and other services, and nothing more. 390 Md. at 378, 889 A.2d at 345–46. It does so by applying, notwithstanding the absence of a Rule comparable to Rule 1–325(b), the same analysis to how Art. 27A meshes Ake's holding with respect to State provision of ancillary services as it applied in *Miller* with regard to trial transcripts. To achieve the result it does, the majority relies heavily on the fact that the Public Defender statute provides that it is the duty of the OPD to supply legal representation and other related services to the indigent defendants. Having declared it to "be the policy of the State of Maryland to provide for the realization of the constitutional guarantees of counsel in the representation of indigents, including related necessary services and facilities, in criminal and juvenile proceedings within the State, and to assure effective assistance and continuity of counsel to indigent accused taken into custody and indigent defendants in criminal and juvenile proceedings before the

courts of the State of Maryland," Art. 27A, § 1 "authorize[s] the Office of Public Defender to administer and assure enforcement of the provisions of this article in accordance with its terms." Section 2(f),[3] in defining "indigent," delineates the perimeters of the services to be provided by the OPD: "the full payment of an attorney and all other necessary expenses of legal representation," to include "[e]xpenses", *i.e.,* "all costs incident to investigation, other pretrial preparation, trial and appeal of a person accused of a serious crime." Section 2(g). Section 4(a) provides:

> "(a) It shall be the primary duty of the Public Defender to provide legal representation for any indigent defendant eligible for services under this article. Legal representation may be provided by the Public Defender, or, subject to the supervision of the Public Defender, by his deputy, by district public defenders, by assistant public defenders, or by panel attorneys as hereinafter provided for."

Whether a defendant is eligible for OPD supplied representation and services depends on the defendant's need, § 7(a), to be determined by the OPD after investigation, § 7(b),[4] and the value of any representation or services provided becomes a

---

3. Art. 27A, § 2 provides:

> "(f) 'Indigent' means any person taken into custody or charged with a serious crime as herein defined under the laws of the State of Maryland or the laws and ordinances of any county, municipality, or Baltimore City, who under oath or affirmation subscribes and states in writing that he is financially unable, without undue hardship, to provide for the full payment of an attorney and all other necessary expenses of legal representation."

4. Art. 27A, § 7(b) provides:

> "(b) The Office of the Public Defender shall make such investigation of the financial status of each defendant at such time or times as the circumstances shall warrant, and in connection therewith the office shall have the authority to require a defendant to execute and deliver such written requests or authorizations as may be necessary under applicable law to provide the office with access to records of public or private sources, otherwise confidential, as may be needed to evaluate eligibility. The office is authorized to obtain information from any public record office of the State or of any subdivision or agency thereof upon request and without payment of any fees ordinarily required by law."

lien on real or personal property of the defendant or to which the defendant acquires an interest or title. Section 7(d).

Despite the absence of a rule pertaining to the procedure for obtaining ancillary services comparable to Rule 1–325(b), a fact that the majority readily concedes, but believes to be answered by the severability question, *see* 390 Md. at 379, 889 A.2d at 346, secure in the belief that *Miller* "is instructive on the question of whether the State may condition the receipt of constitutionally mandated services on representation by the O.P.D," the issue it perceives to be presented, 390 Md. at 375, 889 A.2d at 344, the majority concludes that the ancillary services required to be provided by the OPD are non-severable from the representation it is required to provide. 390 Md. at 374–75, 889 A.2d at 343–44. In so doing, it adopts the rationale of the Court of Special Appeals, which it quoted, with approval, as follows:

"We agree with those states which hold that the dual services provided by the public defender are not severable. The language of Art 27A, § 2, defining indigent as a person unable to 'provide for the full payment of an attorney and all necessary expenses of legal representation,' is a unified enactment and does not contemplate that a defendant be indigent for purposes of 'all necessary expenses' and yet be able to retain private counsel. *See Morton* [*v. Commonwealth,*] 817 S.W.2d [218,] 220 [ (Ky.1991) ], We adopt Kentucky's position, that 'under this definition and the general tenor of the entire Act, inability to obtain counsel and inability to obtain necessary services go hand in hand.' Thus any funding for the necessary services associated with representation are conditioned upon representation by the Public Defender."

*Id.* at 373–74, 889 A.2d at 343, quoting *Moore,* 154 Md.App. at 592, 841 A.2d at 39. And, like the intermediate appellate court, the majority holds "that the O.P.D. is not required to pay for expert assistance or other ancillary services if the defendant is not represented by the O.P.D. (or a panel attorney assigned by the O.P.D.)." *Id.* at 374, 889 A.2d at 343.[5]

Thus, while acknowledging *Ake's* requirement of a threshold showing of indigence and a demonstration of the defense's significant need for the expert, assuming the latter, it opines that state-funded "expert assistance was available to [Moore] so long as he complied with the procedural requirement that he apply for legal representation through the O.P.D. Imposing this requirement on Moore did not violate his constitutional rights." 390 Md. at 378, 889 A.2d at 346.

The majority is wrong. First, it is important that, in *Miller*, there was a Rule that set out precisely and explicitly the process for obtaining a trial transcript for appeal purposes. That it had its genesis in a statute, predating *Griffin* and the Public Defender statute, pertaining to, and only to, the State's obligation to indigent defendants with respect to trial transcripts, first in capital cases and later, after *Griffin*, in all criminal appeals, and that the requirements were retained after the Public Defender statute was enacted further underscore its significance. Indeed, because Rule 1–325(b) directly addressed the State's and the OPD's role when a defendant is indigent and, therefore, unable to afford a trial transcript, specifying expressly when the costs will be subsidized, "in any case in which (1) the Public Defender's Office is authorized by these rules or other law to represent a party, (2) the Public Defender has declined representation of the party, and (3) the party is unable by reason of poverty to pay those costs," the *Miller* result fits easily into a statutory construction analysis. Without a comparable statute regulating the State's obligation to provide expert services to indigent defendants, interpreting Art. 27A consistently with *Miller* is, at best, a stretch.

---

**5.** The majority does not expressly address the situation in which the defendant's counsel is acting *pro bono*. On that subject, the Court of Special Appeals observed:

"Additionally, because appellant's counsel was not providing *pro bono* services, we do not express an opinion on whether a defendant with *pro bono* private counsel is entitled to funding for other services associated with representation."

*Moore v. State,* 154 Md.App. at 592, 841 A.2d at 39 (2004).

## B.

Second, the majority's non-severability holding does not withstand scrutiny. Critical to its soundness is *Morton v. Commonwealth*, 817 S.W.2d 218, 220 (Ky.1991), whose interpretation of Kentucky's public defender statute, and the rationale therefor, we adopted. Similar to this case, the defendant in *Morton*, who also was charged with murder and otherwise was indigent, retained private counsel, paying him a nominal fee of $ 100. Similar to Maryland's Public Defender statute, Kentucky's, KY. REV. STAT. § 31.100, *et. seq.*, declares the State policy with respect to indigent representation:

> "(1) A needy person who is being detained by a law enforcement officer, on suspicion of having committed, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime, or who is accused of having committed a public or status offense or who has been committed to the Department of Juvenile Justice or Cabinet for Health and Family Services for having committed a public or status offense as those are defined by KRS 610.010(1)(a), (b), (c), or (d) or 630.020(2) is entitled:
>
> > "(a) To be represented by an attorney to the same extent as a person having his own counsel is so entitled; and
> >
> > "(b) To be provided with the necessary services and facilities of representation including investigation and other preparation. The courts in which the defendant is tried shall waive all costs."

KY. REV. STAT. § 31.110(1)(a) and (b). Also, as in, and similar to, Maryland's statute, it prescribed who was deemed to be indigent. *See* KY. REV. STAT. § 31.100(3)(a), defining " '[n]eedy person' or 'indigent person' " as "(a) A person eighteen (18) years of age or older or emancipated minor under the age of eighteen (18) who, at the time his need is determined, is unable to provide for the payment of an attorney and all other necessary expenses of representation."

To be sure, the Supreme Court of Kentucky construed this statute to set up a unified scheme, in which the services to be provided by the public defender were non-severable:

"A more difficult question is whether the trial court erred in its determination that a defendant who seeks and obtains the benefits of KRS 31.110(1)(b) may not be represented by retained counsel who declares his intention to continue on a *pro bono* basis. Appellant correctly observes that the statute contains no express prohibition against having the Commonwealth provide 'the necessary services and facilities of representation' when the defendant has obtained his own counsel. Be this as it may, in our view, KRS 31.100, *et. seq.,* is a unified enactment which contemplates the necessity of a comprehensive determination whether a defendant qualifies for the benefits provided. For it to be determined that he does, he must be without the independent means to obtain counsel. The statute surely does not contemplate that a defendant would be indigent for purposes of KRS 31.110(1)(b), but still able to hire an attorney. If such were the case, rarely would any defendant step forward to pay investigative costs and other services necessary for his representation. Indeed, in KRS 31.100(3) 'needy person' or 'indigent person' is defined as 'a person who at the time his need is determined is unable to provide for the payment of an attorney and all other necessary expenses of representation.' Under this definition and the general tenor of the entire Act, inability to obtain counsel and inability to obtain necessary services must go hand-in-hand."

*Morton,* 817 S.W.2d at 220. It did not conclude, however, that the non-severability was absolute or applied in all circumstances.

Immediately following the quoted passage, the court considered another scenario that could arise under the statute and conceded that, in an appropriate case, a different result would obtain:

"In an unusual case, however, it may be that an indigent defendant can obtain counsel which is truly *pro bono;* counsel who has neither sought nor obtained any fee or the

promise thereof for legal services rendered or promised. *In such a circumstance, the dual benefits provided by the Act would indeed be severed.* The defendant would be indigent for purposes of necessary services and facilities, but otherwise be able to provide his own counsel without cost to himself. When such a circumstance produces the severance between ability to obtain counsel and need for other necessary expenses, the statute may be interpreted to permit the trial court to grant indigency status for purposes of **KRS 31.110(1)(b)** only."

817 S.W.2d at 220–221 (emphasis added). Thus, although *Morton* does support the majority's holding, it also contradicts it. Because it recognizes that there may be circumstances, such as representation by a *pro bono* attorney, under which a defendant could obtain State-funded expert services without the involvement of the public defender, it does not support the notion, advanced by the majority, that the OPD is, and always must be, the gatekeeper of State funds and defense attorney competence. In fact, *Morton* undermines the viability of that concept under this statutory scheme.

The gatekeeper function attributed to the OPD is not supported by the statute establishing it. The majority is correct, *see* 390 Md. at 375–76, 889 A.2d at 344, indeed, it is undisputed, that Maryland has established a State-wide public defender system to discharge its responsibility to provide constitutionally guaranteed "legal representation, investigative services, and expert assistance" to indigent defendants. Art. 27A, § 1 does place the duty on the OPD to "administer and assure enforcement of the provision[s] of [Article 27A], in accordance with its terms." Nothing in Art. 27A, however, explicitly, or inferentially, requires that services funded by the State may only be obtained when the OPD either represents the defendant needing them or supervises the attorney representing that defendant. I do not read the words, "administer and assure enforcement of the provision of [Article 27A], in accordance with its terms," as broadly as the majority apparently does. Nor do I believe that the result reached by the majority can be justified by the statement of the goal, directed

to the State itself, "to provide for the realization of the constitutional guarantees of counsel." [6]

Moreover, I disagree that legal representation and the ancillary services required for an adequate defense are non-severable. In this belief, I am far from alone. Courts from other jurisdictions have held that a defendant is entitled to State-funded expert services in circumstances comparable to the petitioner's, as well as when a defendant is being represented *pro bono*. *See, e.g., Ex parte Sanders*, 612 So.2d 1199, 1201 (Ala.1993) (holding indigent defendant has right to public funds to hire expert although represented by counsel retained by family); *Dubose v. State*, 662 So.2d 1189, 1191 (Ala.1995) (following *Sanders*); *People v. Worthy*, 109 Cal.App.3d 514, 167 Cal.Rptr. 402, 406 (1980) (concluding that, upon a proper showing of necessity, trial court must provide an indigent defendant expert services, without regard to whether his counsel is appointed or *pro bono*); *People v. Evans*, 271 Ill.App.3d 495, 208 Ill.Dec. 42, 648 N.E.2d 964, 969 (1995) (concluding that indigent defendant entitled to expert witness funding although represented by private law firm where services provided on *pro bono* basis); *English v. Missildine*, 311 N.W.2d 292, 293–94 (Iowa 1981) (holding Sixth Amendment authority for furnishing investigative services at public expense without regard to whether indigent represented by private counsel); *State v. Jones*, 707 So.2d 975, 977–78 (La. 1998) (holding, although indigent defendant was represented by counsel retained by defendant's father, he was eligible for

---

**6.** Under the majority's theory, the OPD either must represent the indigent defendant or supervise the appointed attorney in some manner so as to prevent abuse of State resources. While I recognize that the OPD has a very limited budget, it strikes me as unusual that the decisions made as to how properly to allocate State resources should be the same decisions made by the representing attorney. In the strange case where two defendants are on trial with opposing theories and one defendant is assigned to an outside conflicts attorney, I find it paradoxical that that conflicts attorney would be somewhat under the control of the OPD should he need certain expert services. Perhaps the gatekeeping function of the OPD should be more in the nature of determining indigency and allocating the funds for the experts and other services, not direct supervision or control.

state-funded necessary services); *State v. Seifert,* 423 N.W.2d 368, 371 (Minn.1988) (holding that an indigent *pro se* criminal appellant must be given access to a trial transcript on a limited basis for the purpose of perfecting his appeal, even though the public defender is not acting as his appellate counsel); *State v. Huchting,* 927 S.W.2d 411, 419 (Mo.Ct.App. 1996) (noting retention of private counsel does not cause a defendant to forfeit his eligibility for state assistance in paying for expert witness or investigative expenses); *State v. Manning,* 234 N.J.Super. 147, 560 A.2d 693, 698–99 (1989) (holding indigent defendant could not be denied state-funded expert services because he was represented by private counsel, whether counsel was *pro bono* or paid by third party); *Widdis v. Second Jud. Dist. Ct.,* 114 Nev. 1224, 968 P.2d 1165, 1168 (Nev.1998) (holding criminal defendant with private counsel constitutionally entitled to reasonable defense services at public expense based on defendant's showing of indigency and need for the services); *State v. Burns,* 4 P.3d 795, 800–02 (Utah 2000) (holding statutory right to publicly funded expert assistance under statute could not be conditioned upon accepting court-appointed counsel in lieu of private counsel retained at father's expense); *State ex rel. Rojas v. Wilkes,* 193 W.Va. 206, 455 S.E.2d 575, 577 (1995) (holding that funds with which defendant's family retained private counsel irrelevant to defendant's right as indigent to have necessary expert assistance provided at state's expense).

Because it involved private counsel, *albeit* provided by a third person and not by the defendant, *English v. Missildine* is on point and instructive. There, the question presented was whether an indigent defendant, charged with theft, had the right to employ an expert and take depositions, the necessity for which was not at issue, at public expense when he was represented by counsel supplied by his mother. An Iowa statute authorizing fees for court-appointed attorneys covered such expenses. Iowa Code Ann. § 815.7 (2004).[7] Conceding

---

7. IOWA CODE ANN. § 8.517 provides:

the defendant's entitlement were he represented by a court-appointed attorney, the State opposed the defendant's petition because he was represented by private counsel. 311 N.W.2d at 293. In support, it made arguments reminiscent of the arguments made, and adopted, in this case: the defendant's only remedy was to accept court appointed or assigned counsel; refusing State-funding of the services did not constitute a constitutional violation since they could be obtained through an alternative State-sanctioned procedure, 311 N.W.2d at 294, and to allow funding in cases other than those in which counsel was appointed would be to give an indigent defendant a right he does not have, to retain counsel of choice. *Id.*

The Supreme Court of Iowa sided with the indigent defendant. Concluding that "authority for the services requested by [the indigent defendant] exists under his sixth amendment right to effective representation of counsel," *id.* at 293, and acknowledging that third party funded representation does not by itself undermine a defendant's indigency, citing *Schmidt v. Uhlenhopp*, 258 Iowa 771, 140 N.W.2d 118 (1966), it held:

> "An attorney who has not entered into a contract authorized under section 13B.4 and who is appointed by the court to represent any person charged with a crime in this state, seeking postconviction relief, against whom a contempt action is pending, appealing a criminal conviction, appealing a denial of postconviction relief, or subject to a proceeding under section 811.1A or chapter 229A or 812, or to serve as counsel for any person or guardian ad litem for any child in juvenile court, shall be entitled to reasonable compensation and expenses. For appointments made on or after July 1, 1999, the reasonable compensation shall be calculated on the basis of sixty dollars per hour for class 'A' felonies, fifty-five dollars per hour for class 'B' felonies, and fifty dollars per hour for all other cases. The expenses shall include any sums as are necessary for investigations in the interest of justice, and the cost of obtaining the transcript of the trial record and briefs if an appeal is filed. The attorney need not follow the case into another county or into the appellate court unless so directed by the court. If the attorney follows the case into another county or into the appellate court, the attorney shall be entitled to compensation as provided in this section. Only one attorney fee shall be so awarded in any one case except that in class 'A' felony cases, two may be authorized."

"For indigents the right to effective counsel includes the right to public payment for reasonably necessary investigative services ... [t]he Constitution does not limit this right to defendants represented by appointed or assigned counsel. The determinative question is the defendant's indigency. When his indigent status is established the 'defendant is constitutionally entitled to those defense services for which he demonstrates a need.'"

311 N.W.2d at 293–294, citing *People v. Worthy*, 109 Cal. App.3d 514, 520, 167 Cal.Rptr. 402, 406 (1980). The court responded to, and rejected, the State's constitutional argument, reasoning:

"The State's constitutional argument begs the question. If, as we have held, the sixth amendment provides authority for furnishing investigative services to indigents at public expense without regard to whether the indigent is represented by counsel at public expense, the fact that indigents represented by counsel at public expense have the same right is not material. It would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services. The State's theory would impose an unreasonable and unnecessary additional burden on the public treasury.

"Moreover, we do not share the State's concern about an indigent's right to be represented by counsel of his choice when the attorney is not paid at public expense. We have recognized that an indigent does not have this right of choice when counsel is paid from public funds .... However, no reason exists for depriving an indigent of the same right of choice as a person of means when the indigent is able to obtain private counsel without public expense."

311 N.W.2d at 294 (citation omitted).

*State v. Burns, supra*, is similarly instructive. In that case, the indigent defendants were represented by private counsel, paid for by a family member. 4 P.3d at 800–802. Being unable to afford the cost of a concededly necessary medical

expert witness, they sought to have that expense paid by the State. Id. at 796–97. Denying the request, the trial court opined: "the [defendants] would have to make a decision as to whether to retain their counsel, paid for by [a defendant's] father, or if they were ultimately found to be indigent so as to qualify for funds for expert witnesses, the court would appoint L[egal] D[efender] A[ssociation] counsel and then the funds for expert assistance would be available." 4 P.3d at 797. The defendants appealed, arguing that it was error for the trial court to force that choice. 4 P.3d at 799. To resolve the issue, the Supreme Court of Utah interpreted, and harmonized, two provisions of Utah Code Ann. §§ 77–32–101 to –704 (1999), the Indigent Defense Act ("Act"): § 77–32–301,[8] outlining the minimum standards required for indigent defense, and § 77–32–6 (1990),[9] designating the options for meeting those standards. It concluded:

"[T]his section cannot be read to mandate the packaging of indigent assistance with LDA representation. To suggest, as the State does, that only those indigents represented by

---

8. UTAH CODE ANN. § 77–32–301 (Supp.1999) provided:

"The following are minimum standards to be provided by each county, city and town for the defense of indigent persons in criminal cases in the courts and various administrative bodies of the state:
"(1) Provide counsel for every indigent person who faces the substantial probability of the deprivation of his liberty;
"(2) Afford timely representation by competent legal counsel;
"(3) Provide the investigatory and other facilities necessary for a complete defense;
"(4) Assure undivided loyalty of defense counsel to the client; and
"(5) Include the taking of a first appeal of right and the prosecuting of other remedies before or after a conviction, considered by the defending counsel to be in the interest of justice except for other and subsequent discretionary appeals or discretionary writ proceedings."

9. UTAH CODE ANN. § 77–32–6 (1990), presently codified, without substantive change, at § 77–32–306 (Supp.1999), provided:

"[G]overning bodies of the counties, cities and towns shall either:
"(1) Authorize the court to provide the services prescribed by this chapter by appointing a qualified attorney in each case and awarding him reasonable compensation and expenses to be paid by the appropriate governing body; or
"(2) Arrange to provide those services through non-profit legal aid or other associations."

LDA are eligible for the minimum services would be a direct contradiction of the plain meaning of section 77–32–1 as well as the legislative purpose of providing indigents with the basic tools of defense. In fact, contrary to its argument, the State indicated at oral argument that an indigent defendant proceeding *pro se* who has declined standby counsel from the LDA would be able to acquire funding for expert assistance.

"Furthermore, rule 15 of the Utah Rules of Criminal Procedure provides that '[u]pon showing that a defendant is financially unable to pay the fees of an expert whose services are necessary for adequate defense, the witness fee shall be paid as if he were called on behalf of the prosecution.' There is no indication in this rule that a defendant must be represented by LDA to qualify for this assistance. Instead, the only prerequisites for eligibility are financial inability to pay and necessity for an adequate defense.

"It follows, therefore, that the only requirements for receiving public assistance for expert witnesses are proof of necessity and establishment of indigence. It is up to the court, not the LDA, to determine indigency and therefore eligibility. While who is paying for a defendant's attorney may be a factor in the determination of indigency, it is not the determinative factor, and in this case, the court did not allow Burns to have her hearing on indigence without condition of LDA representation. Therefore, the trial court erred in failing to determine whether Burns was indigent and in holding instead that LDA representation was a prerequisite to providing the statutorily required minimum standards for an indigent defense. As a result, even though Burns's father was paying for her defense attorney, Burns was entitled to a hearing for a determination of whether she was indigent without the condition that she accept LDA counsel."

4 P.3d at 801–802.

To like effect, *see In re: Cannady, supra,* 126 N.J. 486, 600 A.2d 459, 462. In that case, the court rejected the argument that the New Jersey Public Defender Act precluded the

funding of ancillary services for indigent defendants represented by private counsel, holding instead:

"New Jersey's policy is to provide counsel for all indigent defendants, not just for indigents represented by the OPD. The Act's language states that eligibility for OPD services includes not just a defendant's inability to hire private counsel but also a defendant's ability to pay for all other necessary expenses of representation. Nowhere in the Act is there a requirement that a defendant obtain legal services from the OPD before he or she may obtain ancillary services from it. The Legislature intended that a defendant's right to obtain necessary ancillary services for his or her defense depends on the defendant's indigence and not on whether the defendant is represented by outside counsel."

*Id.* The court, nevertheless, recognizing the need for and "[i]n order to maintain a unitary, centralized Public Defender System," developed a framework to insure that the OPD maintains the requisite control over services provided to defendants represented by outside counsel, the same as it does over services it provides to its own clients. *Id.* at 462–464. In particular, it made clear that "[i]f, [applying the factors it identified], the OPD decides to provide services for a defendant, it is the OPD who shall determine how much money it should expend on such services." *Id.* at 464, citing the Public Defender Statute and noting that it "does not require that it write a blank check for privately-represented defendants." *See also Ex Parte Sanders,* 612 So.2d at 1201 (holding, in a case where private counsel was secured for an indigent man by a family member, that "[t]he simple fact that the defendant's family, with no legal duty to do so, retained counsel for the defendant, does not bar the defendant from obtaining the funds for expert assistance when the defendant shows that the expert assistance is necessary").

## C.

When explaining its application of the *Miller* holding to the case *sub judice,* the majority states that defendants properly may be put to the choice of counsel and the ancillary services

required to be supplied at State expense to ensure an effective defense, because the constitution does not bar the State of Maryland from doing so. 390 Md. at 379, 889 A.2d at 346. I do not agree.

The Sixth Amendment of the United States Constitution [10] guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," *Wheat v. United States*, 486 U.S. 153, 158, 108 S.Ct. 1692, 1694, 100 L.Ed.2d 140, 148 (1988), the purpose of which is to ensure fairness in the criminal justice process. *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564, 567 (1981). Pursuant to that Amendment, the right to counsel is secured by the appointment of counsel, as necessary. *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799, 805 (1963).

Inherent in the constitutional right to counsel is the right to be represented by counsel of choice. *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d at 148–149. That right of choice is not limited to persons with means. While, to be sure, an indigent defendant's right of choice is significantly restricted, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528, 541 (1989) ("The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."); *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d at 149 ("[A] defendant may not insist on representation by an attorney he cannot afford."); *Fowlkes v. State*, 311 Md. 586, 605, 536 A.2d 1149, 1159 (1988)

---

**10.** U.S. CONST. amend. VI provides in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

("for indigent defendants unable to retain private counsel, the right to counsel is but a right to effective legal representation; it is not a right to representation by any particular attorney"); *State v. DeLuna,* 110 Ariz. 497, 520 P.2d 1121, 1124 (1974); *State v. Harper,* 381 So.2d 468, 470 (La.1980), the fact of indigency is not dispositive; "[t]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States,* 491 U.S. at 624–625, 109 S.Ct. at 2652, 105 L.Ed.2d at 541.

The Supreme Court has recognized that the Sixth Amendment right to counsel of choice, in certain situations, is qualified, that "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d at 148. *See also Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–1618, 75 L.Ed.2d 610, 620–621 (1983). Thus,

"The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government."

*Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697, 100 L.Ed.2d at 148–149. Moreover, notwithstanding that the right to counsel ordinarily encompasses a right to retain counsel of one's choice, the latter right does not trump, and will not be permitted to frustrate, the orderly administration of criminal justice. *See Maynard v. Meachum,* 545 F.2d 273, 278 (1st Cir.1976); *Kates v. Nelson,* 435 F.2d 1085, 1088–1089 (9th

Cir.1970); *United States ex rel. Davis v. McMann*, 386 F.2d 611, 618–619 (2d Cir.1967), *cert. denied*, 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153 (1968); *United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir.1963), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *State v. Harper*, 381 So.2d at 470–471; *Rahhal v. State*, 52 Wis.2d 144, 187 N.W.2d 800, 803 (1971).

*Wheat* is exemplary of the latter restriction. There, two court days before his trial was to commence, Mark Wheat ("Wheat"), one of the many co-defendants on trial for charges arising out of an alleged broad-based drug ring, moved to substitute the counsel for two of his co-defendants as his counsel as well. In support of his motion, he asserted his Sixth Amendment right to the counsel of his choice, and his willingness, as well as that of the affected co-defendants, to waive the right to conflict-free counsel. The trial court denied the substitution motion, finding irreconcilable and unwaiveable conflicts of interest for counsel, created by the likelihood that Wheat would be called to testify at any subsequent trial of one of his co-defendants and that the other would testify at Wheat's trial. In affirming the trial court, the Supreme Court noted the timing of the motion, just two days before trial, and emphasized the complexity of the drug distribution scheme alleged and the potential seriousness of the attorney's conflict, involving, as it did, three alleged co-conspirators of varying stature in the distribution scheme. The Court concluded:

> "The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."

*Wheat*, 486 U.S. at 164, 108 S.Ct. at 1700, 100 L.Ed.2d at 152.

Certainly, the petitioner's insistence on counsel of choice, which, by the way, does not burden the State's resources, does not implicate any of the recognized qualifications on the right to choice. Clearly, it does not come close to frustrating the orderly administration of the criminal justice system.

## D.

The majority holds, as we have seen, "that the O.P.D. is not required to pay for expert assistance or other ancillary services if the defendant is not represented by the O.P.D. (or a panel attorney assigned by the O.P.D.)" 390 Md. at 374, 889 A.2d at 343. Amplifying that holding, it explains:

"The operative part of the statutory definition of 'indigent' contained in Art. 27A is that the defendant is financially unable, without undue hardship, to provide for the *full payment of an attorney* and all other necessary expenses of legal representation. The services provided by the O.P.D. are not severable. In order for the defendant to qualify for the benefits provided under the [Public Defender statute] and thereby require the [Office of the Public Defender] to pay for services, the defendant must be without independent means to obtain counsel."

*Id.*

As I interpret this holding, to qualify for State-funded services, a defendant must be represented by the OPD or one of its panel attorneys, but to qualify for OPD representation, he or she "must be without independent means to obtain counsel." Thus, a defendant, though now indigent, who retained counsel when able to do so, would not qualify because, already having counsel, he or she would not be without independent means to obtain counsel. Similarly, a defendant who was always indigent, but had family who retained counsel for him or her or who was able to obtain *pro bono* counsel,[11]

---

**11.** In *State v. Brown*, 135 N.M. 291, 87 P.3d 1073, 1086 (Ct.App.2004) (Vigil, J., dissenting), addressing an issue much like that which this Court is confronting, Judge Vigil advanced, as one ground for his dissent, the strong policy of New Mexico to encourage *pro bono* services. That policy is reflected in the Preamble to the N.M. Rules of Professional Conduct and in its Rule 16–601, requiring New Mexico attorneys to aspire to render at least 50 hours of *pro bono* public legal services per year. Therefore, Judge Vigil admonished the majority, "we should advance that public policy by encouraging and supporting, not

discouraging *pro bono* services." Moreover, Judge Virgil pointed out a necessary consequence of such discouragement:

"[T]he majority opinion results in the unnecessary expenditure of public funds. While the majority recognizes that the Department has a 'limited budget' and an 'obligation to administer its resources so that all of its clients realized [sic] their constitutional rights to counsel and ancillary services', [] its reasoning will result in higher, unnecessary expenditures by the State. First, it results in a greater client base for the Department since it discourages *pro bono* representation. Second, instead of allowing the State to pay only limited expenses of Brown's defense, the majority requires the State to pay for all of them, including the most expensive component, counsel. The majority holding guarantees a need to spend more public funds, instead of encouraging *pro bono* representation with the potential to conserve state funds. It therefore results in an unreasonable and unnecessary burden on the public treasury[,]"

*id.*, concluding:

"Requiring indigent defendants to abandon donated legal services and requiring them to accept representation by public defenders as a condition of receiving other basic tools of an adequate defense will only further increase these burdens."

*Brown*, 87 P.3d at 1086–1087 (Vigil, J., dissenting).

Like New Mexico, Maryland has a strong policy of encouraging attorneys to provide *pro bono* representation to indigent persons, as a public service and as a professional responsibility. Like New Mexico, the Preamble to our Rules of Professional Responsibility, *see* Maryland Rule 16–812, recognizes a lawyer's responsibilities in that regard. It provides, as pertinent:

"A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance. Therefore, all lawyers should devote professional time and resources and use civic influence to ensure equal access to our system of justice for all those who because of economic or social barriers cannot afford or secure adequate legal counsel. A lawyer should aid the legal profession in pursuing these objectives and should help the bar regulate itself in the public interest."

So, too, is that policy reflected in our *pro bono* Rule, Rule 6.1, and because of the requirement, contained in Rule 16–903, that all attorneys annually report their *pro bono* service, it perhaps is stronger than the New Mexico public policy.

Also relevant on this issue is what was said in *People v. Cardenas*, 62 P.3d 621, 625 (Colo.2002) (Hobbs, J., dissenting).

"Allowing the state to pay costs, in conjunction with *pro bono* attorney time, as a matter of economic reality would encourage attorney participation in *pro bono* service. *Pro bono* representation envisions providing legal services without compensation, but not necessarily at high individual expense to the attorney. When an attorney provides *pro bono* service, she demonstrates a commitment to the public interest. When private counsel agrees to represent an indigent defendant, the burden and financial cost is taken off the state public defender's office. Allowing indigent defendants to receive

would not qualify because he or she was not represented by the OPD or a panel attorney. The majority rejoins that the defendant is not without recourse, he or she could accept OPD representation, with which comes the ancillary services, and that only requires either that the defendant forego the counsel of choice, whether retained when able, supplied by a third party or provided *pro bono*, who is willing and able to continue the representation and with whose services the defendant is satisfied, or that counsel become a panel attorney subject to the supervision of the OPD.[12]

---

support services, at the state's expense, even when they are represented by private counsel, encourages counsel to provide the service and saves the state the cost of attorney's fees."

12. I recognize and acknowledge that the budget of the Office of the Public Defender is overburdened and, so, there can be no dispute that the OPD has a role to play in the decision to pay for ancillary services. As Maryland's is a unitary, centralized Public Defender System, I do not doubt the value of the OPD maintaining appropriate control over services provided to defendants represented by outside counsel, preferably to the same extent as it exercises control over the expenditure of funds for services it provides to its own clients. Perhaps, as was done in *In re Cannady*, 126 N.J. 486, 600 A.2d 459, 462 (1991), a framework needs to be developed to insure that the OPD occupies that position and discharges that responsibility. Such a framework would recognize that the indigent defendant does not have the right, at the State's expense, to select the most expensive expert. *See Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). It would also provide a process for the defendant to establish eligibility, *i.e.* indigency, and also the need for the services sought.

Courts that have been presented with the issue have held that permitting defendants represented by outside attorneys to request State funds for ancillary services would not unduly burden the system. In *Chao v. State,* 780 A.2d 1060, 1072 (Del.2001), rejecting the argument that such a regime would create a judicial "hodgepodge" in which the claims for services would overburden the system and the Office of the Public Defender would lose control over its budget, the Delaware Supreme Court held that (1) the determination of indigency was a routine practice, (2) trial courts were routinely asked whether certain investigative services were "necessary to a defense," and (3) public funding would only be available in limited circumstances under trial court discretion, where the court deemed it unnecessary for the private counsel to withdraw in favor of the public defender.

The Vermont Supreme Court, in response to the State's concern that allowing necessary services to be State-funded would lead to an "unfettered" reimbursement of expenses incurred by defendants, responded:

This scheme infringes on the indigent defendant's Sixth Amendment rights to counsel of choice, for the reasons discussed. In addition, it uses the wrong test of eligibility for ancillary services; rather than indigency and necessity, the factors identified and addressed in *Ake*, the majority predicates entitlement to ancillary services on the status of the attorney representing the indigent defendant. At least as important, the majority's interpretation of Article 27A produces anomalous and absurd results. Delaware, in *Bailey v. State*, 438 A.2d 877, 878 (Del.1981), held that "a defendant who is indigent but who manages (through the assistance of others) to retain counsel is not entitled to the services of a Public Defender appointee nor to funding from the Public Defender's appropriation to employ an investigator as part of his defense effort." Nevertheless, it recognized an illogical aspect to its holding: "an indigent defendant who relieves the public of the burden of representing him cannot secure investigative assistance which he can get (under the Public Defender Act) if he places the entire burden on the public." *Id.* In *State v. Wool*, 162 Vt. 342, 648 A.2d 655, 660 (1994), the Supreme Court of Vermont held that, under its Public Defender statute, "an individual may qualify as 'needy' despite the fact that the person can afford to pay for the services of or can otherwise retain an attorney, but cannot afford other necessary representation expenses ... [and] that [that statute] must be construed to entitle needy persons who are represented, either by an attorney or themselves, to public funding for other

---

"That is simply not the case .... To receive reimbursement, a defendant must show that a requested service is necessary to mount an adequate defense .... Anyone who has ever been responsible for a budget, whether for a family, a business, or a large state agency, can understand the frustration of bearing financial responsibility for expenses that someone else controls. Nonetheless, we cannot see that this system poses an unmanageable problem for the Defender General. Indeed, the primary expense of that office—the number of needy defendants requiring representation—is entirely out of the control of the Defender General. And even in cases where the defendant is represented by a public defender, the court may order the Defender General to pay for a necessary service."
*State v. Handson*, 166 Vt. 85, 689 A.2d 1081, 1084 (1996).

necessary expenses." That interpretation, it concluded, "fosters sound fiscal and public policy, because a defendant would not be required to forego *pro bono* counsel or self-representation simply to obtain associated services at the public expense." *Id.,* citing *State v. Manning,* 234 N.J.Super. 147, 560 A.2d 693, 699 (1989). *See State v. Handson,* 166 Vt. 85, 689 A.2d 1081, 1083 (1996), in which the court, in assessing the cost of necessary expenses in connection with the defendant's *pro se* defense against the State's public defender, observed: "[b]y waiving the right to a public defender, defendant relieved the Defender General of a substantial financial obligation." *See* also *Coyazo v. State,* 120 N.M. 47, 897 P.2d 234, 240 (1995) (commenting on the advantageous impact maintenance of a cadre of private attorneys has on the public defender office—"lessens the state's requirement for full time employees in the Public Defender Department").

The high courts of Iowa and Minnesota agree. We have already seen that the Iowa Supreme Court has held, in *English v. Missildine,* 311 N.W.2d at 294, that "the sixth amendment provides authority for furnishing investigative services to indigents at public expense without regard to whether the indigent is represented by counsel at public expense." The court has also observed:

> "It would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services. The State's theory would impose an unreasonable and unnecessary additional burden on the public treasury."

*Id.*

The Supreme Court of Minnesota made essentially the same point in *State v. Pederson,* 600 N.W.2d 451, 454 (Minn.1999), a case in which the court held an indigent defendant entitled to a trial transcript, despite the fact that he was represented by private appellate counsel. Rejecting the state's argument that legal representation and ancillary services were a "package deal," the court stated:

"We acknowledge the concerns of the public defender and the dissent, but conclude that, like any other indigent criminal appellant whom the public defender offers to represent, Pederson is entitled to both the services of a public defender and a trial transcript at public expense.... We see no reason to force the state to pay for a service the indigent criminal appellant does not wish to use. Accordingly, Pederson has the right to refuse the services of the public defender, yet receive a trial transcript at public expense."

*Pederson,* 600 N.W.2d at 454.

For the preceding reasons, I dissent.